

1999 Decisions

**Opinions of the United States Court of Appeals for the Third Circuit**

6-28-1999

# Bel Ray Co Inc v. Chemrite(Pty) LTD

Precedential or Non-Precedential:

Docket 98-6297

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Bel Ray Co Inc v. Chemrite(Pty) LTD" (1999). *1999 Decisions.* Paper 170.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/170

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 28, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-6297

BEL-RAY COMPANY, INC.

v.

CHEMRITE (PTY) LTD.; LUBRITENE (PTY) LTD.;
IVOR H. KAHN; CESARE CARBONARE; IAN ROBERTSON;
PIERRE VAN DER RIET

       Lubritene (Pty) Ltd.; Ivor H. Kahn; Cesare Carbonare;
       Ian Robertson; Pierre Van Der Riet,
       Appellants

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 98-cv-00424)
District Judge: Honorable Katherine S. Hayden

Argued March 1, 1999

BEFORE: STAPLETON, RENDELL and ALDISERT,
Circuit Judges

(Opinion Filed June 28, 1999)

       Sanford D. Brown (Argued)
       Cerrato, Dawes, Collins, Saker
        & Brown
       509 Stillwells Corner Road
       P.O. Box 6009
       Freehold, NJ 07728

        Attorney for Appellees

        Louis R. Moffa, Jr. (Argued)
        Edward J. McBride, Jr.
        Schnader, Harrison, Segal & Lewis
        220 Lake Drive East - Suite 200
        Cherry Hill, NJ 08002-1165
         Attorney for Appellants

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Lubritene Ltd. ("Lubritene") and four of its directors and officers appeal the District Court's order compelling them to arbitrate claims brought against them by Bel-Ray Company, Inc. ("Bel-Ray"). Lubritene claims the District Court erroneously concluded that it was bound under its predecessor's arbitration agreement. The directors and officers contend that the District Court erred because it lacked personal jurisdiction over them, and because they are not bound by their corporate principal's agreement to arbitrate. We agree that Lubritene is bound to arbitrate this dispute and that the District Court had personal jurisdiction over the directors and officers. We conclude, however, that the directors and officers are not bound to arbitrate Bel-Ray's claims against them. Accordingly, we will affirm in part and reverse in part.

I.

Bel-Ray is a New Jersey corporation engaged in the business of manufacturing specialty lubricants for the international mining, industrial and consumer markets. Bel-Ray has developed special formulas and blending technology for its products and maintains them in the highest confidentiality. Between 1983 and 1996, Bel-Ray entered into a series of agreements with Chemrite (Pty.) Ltd., a South African corporation, for the blending and distribution of Bel-Ray products in South Africa. Ivor H. Kahn, Cesare Carbonare, Ian Robertson, and Pierre Van Der Riet (the "Individual Appellants") were officers or directors, as well as shareholders, of Chemrite.

2

In January of 1996, the parties entered into the most recent set of these agreements (the "Trade Agreements") by executing a (i) Distributor Sales Agreement, (ii) Blending Manufacturing License Agreement, and (iii) License Agreement to Trade Name. The Trade Agreements allowed Chemrite to market and sell Bel-Ray products, and to produce and market products under Bel-Ray's trade name in South Africa. Each agreement contains two clauses relevant to this appeal. First, each agreement required arbitration of "any and all disputes relating to th[e] agreement or its breach" in Wall Township, New Jersey. (A38; A60; A86) Arbitration was to proceed under the American Arbitration Association rules and New Jersey substantive law. Second, the agreements specifically require Bel-Ray's written consent to any assignment of Chemrite's interests under the Trade Agreements.

On August 20, 1996, Chemrite sent Bel-Ray a fax indicating that it had changed its name to "Lubritene (Pty) Ltd." The change became more than nominal on October 10, 1996, when Chemrite sold its lubricant business, expressly including its rights under the Trade Agreements to Lubritene, a newly formed business entity, and Chemrite entered liquidation. Lubritene continued Chemrite's lubricant business at the same location with the same employees and management, and the Individual Appellants became Lubritene shareholders, directors and officers. Lubritene and Bel-Ray continued to conduct business in the same manner under the Trade Agreements. In November of 1996, Lubritene sent Bel-Ray a package of documents that included the October 10th sale of assets documents and thereby informed Bel-Ray that Lubritene was a new and separate company.

In the Spring of 1997, the parties engaged in a series of negotiations. These negotiations were initially motivated by Bel-Ray's interest in acquiring a stake in Lubritene. When it became clear that such an acquisition was not in the cards, the negotiations turned to focus upon modifying the Trade Agreements to add additional industrial products and to extend their terms to six years. During negotiating sessions in South Africa, Lubritene representatives queried Bel-Ray representative Linda Kiefer as to whether Bel-Ray

3

believed there was a legally binding agreement between Lubritene and Bel-Ray. According to Keifer:

> [she] explained to them that, not being an attorney, [she] could not comment on the legal enforceability of the [Trade Agreements], but told them that Bel-Ray's attorneys had advised [her] that technically and legally we do have an agreement. Moreover, [she] pointed out that both Bel-Ray and Lubritene had continued to conduct business in the same manner without interruption, since the agreements were signed . . . [and] that [she] understood from Bel-Ray's attorneys that as long as we both continued to do business according to the terms of the existing agreements while we discussed a possible new relationship, Bel-Ray had an implied agreement with Lubritene on the same terms as the existing agreements with Chemrite.

(A285). Six Lubritene affiants, however, contend that Keifer stated that "technically and legally there is no agreement between Lubritene and Bel-Ray" because any assignment of the Chemrite agreement required Bel-Ray's written consent, which had not yet been granted.

Soon after these negotiations, a former Lubritene director brought internal corporate documents to Bel-Ray's attention. Among these documents were the minutes of a Lubritene board meeting held in anticipation of the Spring 1997 negotiations "to resolve the legal stance Lubritene (Pty) Ltd must take in respect of the Bel-Ray Company Inc[.] agreement." (A127) Lubritene's counsel advised the board at the meeting that:

> while admittedly the [Trade Agreements were] entered into between Chemrite Southern Africa (Pty) Ltd[.,] and Bel-Ray Company Inc.[,] after the deregistration/liquidation of Chemrite Southern Africa (Pty) Ltd[.], Bel-Ray still continued to deal commercially with Lubritene (Pty) Ltd and therefore, Bel-Ray's conduct has basically assumed that the assigned agreements were in fact assigned to Lubritene (Pty) Ltd.[.] However, the agreements state that the transfer of the agreements must be approved in writing by Bel-Ray.

4

Id. The board then resolved to (i) liquidate Chemrite; (ii) "continue to trade with Bel–Ray Company Inc as is and not [to] suggest any changes to the current agreement when Linda Kiefer and Bernie Meeks visit South Africa in April"; (iii) create another new company and transfer all of Lubritene's business other than Bel–Ray to that company so that Lubritene "will have no assets" and "[i]f Bel–Ray decides to take legal action against Lubritene (Pty) Ltd, there will be nothing left in the company and hence Bel–Ray will not recover any damages"; and (iv) when Bel–Ray seeks to renew the Trade Agreements to inform them that the Trade Agreements were with Chemrite, "which does not exist anymore and that the agreements are no longer valid." Id. The minutes end by instructing that "[i]t is vital that we do not alert Bel–Ray to our plans and hence we must be very cautious and circumspect when we ALL meet with them in April." Id. (emphasis in original).

Bel–Ray alleges that these minutes and the other documents brought to them by the former Lubritene director reveal that Lubritene, and the Individual Appellants as its officers and directors, conspired to misappropriate Bel–Ray's technology and other proprietary information and intentionally defrauded Bel–Ray by leading it to believe that Lubritene would abide by the Trade Agreements. Additionally, they allege that Lubritene marketed Bel–Ray products falsely under Lubritene's trade name, and conversely marketed inferior Lubritene products under Bel–Ray's trade name thereby damaging Bel–Ray's business reputation.

Bel–Ray filed this action in the United States District Court for the District of New Jersey to compel Lubritene and the Individual Appellants to arbitrate their claims under the Trade Agreements' arbitration clauses. Bel–Ray alleges that Lubritene's actions amount to the business torts of (i) unfair competition, (ii) fraud, and (iii) misappropriation. Bel–Ray also claims that these same actions constitute breaches of the Trade Agreements.1

_____

1. Additionally, Bel–Ray alleges that Lubritene owes it $64,532.60 for products received but not paid for. These products were purchased under bills of lading between Bel–Ray and Lubritene that included arbitration clauses for disputes regarding amounts owed. The parties do not discuss these claims in their briefs to this Court. Nonetheless, it would appear that compelling arbitration of these claims was proper.

5

Lubritene and the Individual Appellants, jointly represented, filed an answer asserting inter alia lack of personal jurisdiction and counterclaims. The counterclaims alleged that Bel-Ray had commenced related proceedings in South Africa to enjoin Lubritene from continuing to use its intellectual property and trade name, and requested the District Court to either (i) stay the proceedings, or (ii) enjoin Bel-Ray from seeking to compel arbitration because it had waived its right to arbitrate by initiating the South African litigation. Two months later, the Individual Appellants filed a motion on their counterclaims requesting a stay, or alternatively, summary judgment enjoining Bel-Ray from seeking to compel arbitration.

The District Court denied the appellants' motion. Months later, the Court granted Bel-Ray summary judgment and entered an order compelling arbitration on August 10, 1998. Lubritene and the Individual Appellants appeal this order.

II.

The District Court had jurisdiction under 9 U.S.C.S 203 because this action to compel arbitration between international parties falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. See 9 U.S.C. SS 201-208. We have jurisdiction pursuant to 28 U.S.C. S 1291. We review the District Court's summary judgment order compelling arbitration de novo and apply the same test that the District Court should have applied. Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, AFL-CIO, 982 F.2d 884, 887 (3d Cir. 1992). "[P]ursuant to Fed. R. Civ. P. 56(c), we ask: `(1) is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?' " Id. (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir.1992)).

III.

We begin with the propriety of the District Court's order to the extent it compelled Lubritene to arbitrate Bel-Ray's claims. Under the Federal Arbitration Act ("FAA"), a court may only compel a party to arbitrate where that party has

6

entered into a written agreement to arbitrate that covers the dispute. See 9 U.S.C. SS 2 & 206. The arbitration clauses in the Trade Agreements are the only written agreements to arbitrate offered in this case. It is undisputed that these agreements were entered into by Chemrite and Bel-Ray, and that Chemrite subsequently assigned the agreements to Lubritene. If these assignments are effective, then the District Court's order should be affirmed. Lubritene, however, contends that the assignments are ineffective because Bel-Ray did not consent to the assignments in writing as the Trade Agreements require. They therefore argue that there is no written agreement to arbitrate and we must reverse the District Court's order.

Thus, according to Lubritene, this case turns on the effect to be given to the Trade Agreements' requirement that Bel-Ray consent in writing to any assignment of Chemrite's interest. As noted, the Trade Agreements are international agreements between United States and South African parties. To determine the legal effect of this provision, we must first resolve the threshold matter of which jurisdiction's contract law we should apply. Ordinarily, this would require a conflict of laws analysis to determine which state had the weightier interest in having its law apply in resolving the relevant issue. Because of a failure of proof discussed below, however, we will apply the law of the forum.

Federal Rule of Civil Procedure 44.1 controls determinations of foreign law in federal court. It provides:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1. This rule provides courts with broad authority to conduct their own independent research to determine foreign law but imposes no duty upon them to do

7

so. See Carey v. Bahama Cruise Lines, 864 F.2d 201, 205 (1st Cir. 1988)("[Rule] 44.1 empowers a federal court to determine foreign law on its own, but does not oblige it to do so."); Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150, 155 n.3 (2d Cir. 1968) (Friendly, J.) (same).

The parties therefore generally carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case. See Whirlpool Fin. Corp. v. Sevaux, 96 F.3d 216, 221 (7th Cir. 1996)(holding that party waived conflicts of law issue because it failed to fulfill its obligation under Rule 44.1 "to provide the district court with "reasonable notice" of his intention to raise an issue of foreign law."); Restatement (Second) Conflict of Laws S 136 cmt. f (1971) ("[T]he party who claims that the foreign law is different from the local law of the forum has the burden of establishing the content of the foreign law."). Where parties fail to satisfy either burden the court will ordinarily apply the forum's law. See Walter v. Netherlands Mead N.V., 514 F.2d 1130, 1137 n.14 (3d Cir. 1975); see also Banco de Credito Indus. v. Tesoreria General, 990 F.2d 827, 837 (5th Cir. 1993)("When the parties have failed to conclusively establish foreign law, a court is entitled to look to its own forum's law in order to fill any gaps."); Carey, 864 F.2d at 205 (applying forum's law where parties fail to raise issue of foreign law's applicability); Commercial Ins. Co. of Newark, N.J. v. Pacific-Peru Constr. Corp., 558 F.2d 948, 952 (9th Cir. 1977)(applying forum law where parties failed to raise issue of foreign law's applicability); Restatement (Second) Conflict of Laws S 136 cmt. h (1971) ("[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own law, except when to do so would not meet the needs of the case or would not be in the interests of justice.").

Lubritene claims that it cannot be bound by Chemrite's agreement to arbitrate because, as a matter of contract law, the written consent provision prevents it from becoming Chemrite's assignee. Lubritene, however, has not raised the issue of whether South African contract law applies to its claim, nor has it provided any evidence to prove the

8

substance of that law.2 We therefore will apply the law of the forum.

This case was brought in New Jersey. Thus, we now turn to consider that state's contract law. The New Jersey Supreme Court has not yet addressed the effect of contractual provisions limiting or prohibiting assignments. Nevertheless, we are not without guidance because the Superior Court's Appellate Division recently addressed this issue in Garden State Buildings L.P. v. First Fidelity Bank, N.A., 702 A.2d 1315 (N.J. Super. Ct. App. Div. 1997). There, a partnership had entered a loan agreement with Midatlantic Bank for the construction of a new hotel. The parties subsequently entered into a modification agreement to extend the loan's maturity date, which provided that: "No party hereto shall assign this Letter Agreement (or assign any right or delegate any obligation contained herein) without the prior written consent of the other party hereto and any such assignment shall be void." Id. at 1318. Midatlantic subsequently assigned the loan to Starwood without obtaining the partnership's prior written consent. The partnership acknowledged Starwood's rights under the loan agreement by making payments to, and eventually entering a settlement agreement with, Starwood. Nonetheless, the partnership filed suit against Midatlantic for damages arising from its breach of the modification agreement's assignment clause. It argued that it was not required to void the assignment, but could recognize its validity while still preserving its right to sue Midatlantic for breach of its covenant not to assign without the partnership's written consent.

To resolve this claim the Appellate Division looked to

_____

2. The only information regarding South African law that Lubritene has provided relates to the distinct issue of successor liability. This information relates to Lubritene's claim that, if the District Court properly considered successor liability, it should have used South African, not New Jersey, law on the issue. Lubritene's primary argument, however, is that the District Court need not consider successor liability principles because this case can be resolved as a matter of contract law. In the course of making this argument, Lubritene does not raise the issue of which country's contract law applies.

9

S 322 of the Restatement (Second) of Contracts, which provides in relevant part:

> (2) A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested . . . .

> (b) gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective . . .

Restatement (Second) of Contracts S 322 (1981) (emphasis added). The Court, distinguished between an assignment provision's effect upon a party's "power" to assign, as opposed to its "right" to assign. A party's "power" to assign is only limited where the parties clearly manifest a different intention. According to the Court:

> `[t]o reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, such clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way.' Otherwise, the assignment is effective, and the obligor has the right to damages.

Garden State, 702 A.2d at 1321 (quoting University Mews Assoc's v. Jeanmarie, 471 N.Y.S.2d 457, 461 (N.Y. Sup. Ct. 1984)). The Court concluded that the parties had sufficiently manifested their intent to limit Midatlantic's power to assign the loan because the anti-assignment clause clearly provided that assignments without the other party's written consent "shall be void." Id. at 1322.

In adopting S 322, New Jersey joins numerous other jurisdictions that follow the general rule that contractual provisions limiting or prohibiting assignments operate only to limit a parties' right to assign the contract, but not their power to do so, unless the parties' manifest an intent to the contrary with specificity. See Cedar Point Apartments, Ltd. v. Cedar Point Inv. Corp., 693 F.2d 748, 754 & n.4 (8th Cir. 1982); Pro Cardiago Pronto Socorro Cardiological, S.A. v. Trussell, 863 F. Supp. 135, 137 (S.D.N.Y. 1994); Lomas Mortgage U.S.A., Inc. v. W.E. O'Neil Constr. Co., 812 F. Supp. 841, 843-44 (N.D. Ill. 1993); Allhusen v. Caristo

10

Const. Corp., 103 N.E.2d 891, 893 (N.Y. 1952); Macklowe v. 42nd St. Dev. Corp., 566 N.Y.S.2d 606, 606-07 (N.Y. Sup. Ct. App. Div. 1991); Sullivan v. International Fidelity Ins. Co., 465 N.Y.S.2d 235, 237 (N.Y. Sup. Ct. App. Div. 1983); University Mews Assoc's v. Jeanmarie, 471 N.Y.S.2d 457, 461 (N.Y. Sup. Ct. 1984). To meet this standard the assignment provision must generally state that non-conforming assignments (i) shall be "void" or "invalid," or (ii) that the assignee shall acquire no rights or the non-assigning party shall not recognize any such assignment. See Garden State, 702 A.2d at 1321 ("clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way"); Cedar Point, 693 F.2d at 754 n.4 (same); Allhusen, 103 N.E.2d at 893; Sullivan, 465 N.Y.S.2d at 238; University Mews, 471 N.Y.S.2d at 461. In the absence of such language, the provision limiting or prohibiting assignments will be interpreted merely as a covenant not to assign, or to follow specific procedures--typically obtaining the non-assigning party's prior written consent--before assigning. Breach of such a covenant may render the assigning party liable in damages to the non-assigning party. The assignment, however, remains valid and enforceable against both the assignor and the assignee. See Garden State, 702 A.2d at 1321; Cedar Point, 693 F.2d at 754 n.4; Pro Cadiago, 863 F. Supp. at 137; Lomas, 812 F. Supp. at 844; Allhusen, 103 N.E.2d at 892; Sullivan, 465 N.Y.S.2d at 237.

The Trade Agreements in this case contain the following assignment provisions: (i) the Distributor Sales Agreement S 7.06 provides that the "Agreement and the obligations and rights under this Agreement will not be assignable by [Chemrite] without express prior written consent of Bel-Ray, which may be withheld at the sole discretion of Bel-Ray"; (ii) the Blending and Manufacturing License Agreement S 7.05 provides that the "Agreement and the obligations and rights hereunder will not be assignable by [Chemrite] without the express prior written consent of BEL-RAY"; and (iii) the License Agreement to Trade Name S 6.06 provides that the "Agreement, and the obligations and rights under this agreement will not be assignable without the express written consent of all Parties to this Agreement." (A39, A61, A83). None contain terms specifically stating that an

11

assignment without Bel-Ray's written consent would be void or invalid. Several courts have considered virtually identical clauses and concluded that they did not contain the necessary express language to limit the assigning party's power to assign. See Lomas, 812 F. Supp. at 844; Macklowe, 566 N.Y.S.2d at 606-07; Sullivan, 465 N.Y.S.2d at 236-38.

The Trade Agreements' assignment clauses do not contain the requisite clear language to limit Chemrite's "power" to assign the Trade Agreements. Chemrite's assignment to Lubritene is therefore enforceable, and Lubritene is bound to arbitrate claims "relating to" the Trade Agreements pursuant to their arbitration clauses. We therefore agree with the District Court that Bel-Ray was entitled to an order compelling Lubritene to arbitrate.

IV.

We now turn to consider whether the District Court properly compelled the Individual Appellants to arbitrate. The Individual Appellants contend that the District Court erred because it lacked personal jurisdiction over them, and because they did not individually agree to arbitrate claims with Bel-Ray. We examine these claims in turn.

A.

The Individual Appellants first argue that the District Court lacked personal jurisdiction over them. Bel-Ray rejoins that appellants waived personal jurisdiction by seeking summary judgment on their counterclaim for affirmative injunctive relief against Bel-Ray. We agree.

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." Insurance Corp. of Ir., Ltd., et al. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982). Moreover, the "actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not." Id. at 704-705. In particular, where a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the

12

court with respect to the adjudication of claims arising from the same subject matter. Adam v. Saenger, 303 U.S. 59 (1938).

Because there "exists a strong policy to conserve judicial time and resources," we have held that "preliminary matters such as . . . personal jurisdiction . . . should be raised and disposed of before the court considers the merits or quasi-merits of a controversy." Wyrough & Loser, Inc. v. Pelmore Lab., Inc., 376 F.2d 543, 547 (3d Cir. 1967). Accordingly, in Wyrough we held that a defendant who participates in the adjudication of the plaintiff's application for a preliminary injunction without securing a determination of his challenge to the court's personal jurisdiction over him submits himself to the jurisdiction of the court unless it is not reasonably feasible tofirst secure that determination. See id. This is true even where the defendant raises his personal jurisdiction defense at the earliest point required by the Federal Rules. See id.

While the Individual Appellants timely raised their personal jurisdiction defense in their answer as required by the Federal Rules, they did far more than resist an application for a preliminary injunction. They asked the District Court for affirmative relief before securing a determination on their personal jurisdiction defenses. On May 21, 1998, three months after they had entered their appearances before the District Court, the Individual Appellants filed motions for summary judgment on their counterclaim asking the Court to enjoin Bel-Ray from seeking arbitration. They thereafter proceeded to litigate those motions before securing a personal jurisdiction determination. Their affidavits supporting their personal jurisdiction defenses were not filed until a little over a month after their motion for summary judgment was denied. Because the record contains nothing suggesting that it would be unfair to conclude that the Individual Appellants thereby submitted themselves to the District Court's jurisdiction, we so hold.

B.

Arbitration is strictly a matter of contract. If a party has not agreed to arbitrate, the courts have no authority to

13

mandate that he do so. United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). The Individual Appellants claim that the District Court violated this fundamental principle because they have not signed an agreement consenting to submit disputes between themselves and Bel-Ray to arbitration. When asked to enforce an arbitration agreement against a non-signatory, we ask whether he or she is bound by that agreement under traditional principles of contract and agency law. Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503 (3d Cir. 1994); Pritzker v. Merrill, Lynch, Pierce, Fenner & Smith, 7 F.3d 1110, 1121 (3d Cir. 1993).

Bel-Ray insists that the Individual Appellants are bound by the arbitration clauses in the Trade Agreements"based on their status as [Lubritene's] agents," citing our decision in Pritzker. Appellants' Br. at 16. Bel-Ray does not explicate, however, what principle of agency law enabled Lubritene to contract away the Individual Appellants' right to litigate their personal liability on claims brought against them. Our reading of Pritzker does not suggest such a principle, and our research has uncovered none.

In Pritzker, the trustees of a pension plan sued the brokerage firm which traded on behalf of the plan, the broker in the firm that serviced the plan's account, and a sister corporation of the brokerage firm that provided the plan with investment advice. The arbitration clause that the trustees sought to enforce was set forth in the Cash Management Agreement between the trustees and the brokerage firm; neither the broker nor the sister corporation signed the agreement. After a dispute arose regarding investment decisions and the trusteesfiled suit, the defendants sought to compel arbitration. The trustees resisted arbitration and argued that they could not be compelled to arbitrate against the broker and the sister corporation because they had not entered into an arbitration agreement with those parties. We rejected this argument.

In Pritzker, the issue was whether a signatory to an arbitration agreement could be compelled to arbitrate claims it had against the agents of the other party to the agreement. As we made clear at the outset of the opinion,

14

the result turned on a construction of the arbitration clause to which the trustees had agreed -- i.e., whether it was broad enough in scope to encompass claims against agents of the brokerage firm arising out of the relationship between the brokerage firm and the trustees. We held that by agreeing in the context of the customer's agreement to arbitrate "all controversies which may arise between us," the trustees had committed themselves to arbitrate claims against the firm and its agents arising out of the brokerage relationship. We noted that since the brokerage could act only through agents and employees, "an arbitration agreement would be of little value if it did not extend to [them]." Id. at 1122 (quoting Troll v. Paciolla, 748 F. Supp. 305, 309 (E.D. Pa. 1990). Accordingly, "[i]n keeping with the federal policy favoring arbitration," we "extend[ed] the scope of the arbitration clauses to agents of the party who signed the agreements." Id. at 1122.

The issue before us, however, is not the construction of the arbitration clauses. The relevant issue here is whether an employee or agent who did not agree to arbitrate can be compelled to arbitrate his personal liability on the basis of a commitment made by the corporation he serves.

The only other cases relied upon by Bel-Ray are our decision in Isidor Paiewonsky Assoc., Inc. v. Sharp Properties Inc., 998 F.3d 145 (3d Cir. 1993), and the decision of the Court of Appeals for the Ninth Circuit in Letizia v. Prudential Bache Securities, 802 F.2d 1185 (9th Cir. 1986). Like Pritzker, Letizia was a suit by a client against a brokerage firm and the two firm employees who handled the account. As in Pritzker, the employees sought to compel the client to arbitrate his claims against them and the result turned on construction of the arbitration clause in the agreement between the client and thefirm. The court concluded that "all of the individual defendants' allegedly wrongful acts related to their handling of[the client's] securities account" and that the firm had "clearly indicated its intentions [in the agreement] to protect its employees" from the expense of litigation arising from their work activities. Id. at 1188. Accordingly, the client's claims against the employees were held to be within the scope of the client's commitment to arbitrate, and the employees were held to be entitled to enforce that commitment.

15

In the Sharp case, a landlord and "head tenant" of a shopping center had entered a master lease containing an arbitration clause. The issue we were required to decide was whether a subtenant, who had not signed the master lease, was bound by an award resulting from arbitration between the landlord and the "head tenant." The award authorized the landlord to regain possession of the portion of the leasehold occupied by the subtenant. We held that the subtenant was bound, despite the fact that it was not a party to the arbitration agreement. We first looked to "basic principles of landlord-tenant law":

> As a general matter, it is well-established that a subtenant's interest in real property cannot exceed that of the head tenant because the subtenant's interest in the real property is strictly derivative of that of the head tenant. Normally, then, if a head tenant loses its rights to continued possession of the property in question, so does the subtenant . . .

> Thus, to the extent that common law principles of the rights of subtenants inform our analysis here, [the subtenant] cannot complain when its rights to continued possession of the Bolero Building ended upon an adverse adjudication of the rights of its sublessor, [the head tenant].

Sharp, 998 F.2d at 154.

We then turned to the FAA and determined that none of its provisions required a different result. Accordingly, we enforced the award against the subtenant. While the general approach we followed in Sharp is equally applicable here, the ruling there provides little help in resolving this case.

We thus conclude that Bel-Ray has tendered no authorities supporting its position. Nor has our own research revealed supporting authority. On the contrary, the authority that does exist suggests to us that the District Court erred in compelling the Individual Appellees to arbitrate.

Generally, of course, an agent of a disclosed principal, even one who negotiates and signs a contract for her

16

principal, does not become a party to the contract. Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503 (3d Cir. 1994); Restatement (Second) of Agency S 320 (1958). Moreover, under traditional agency principles, the only other way we understand that an agent can be bound by the terms of a contract is if she is made a party to the contract by her principal acting on her behalf with actual, implied, or apparent authority. The record in this case will not support a decision for Bel-Ray on any of these theories.

Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773 (2d Cir. 1995), catalogues the various theories recognized by the Court of Appeals for the Second Circuit for binding non-signatories to an arbitration clause. After noting that each theory is based on "common law principles of contract and agency law," the court set forth the following list:

> 1) incorporation by reference; 2) assumption;
> 3) agency; 4) veil-piercing/alter ego; and 5)  estoppel.

Thomson, 64 F.3d at 776.

In Thomson, the District Court compelled a non-signatory parent corporation to arbitrate based on an arbitration agreement between its subsidiary and one of the subsidiary's suppliers. The Court of Appeals reversed. After analyzing the record before it under each of the enumerated theories, the Court held that the District Court lacked authority under common law contract and agency principles to compel the parent to arbitrate even though the claim against it arose out of the relationship between the subsidiary and the supplier.

Having similarly compared our record with the Thomson court's explanation of each of the five enumerated theories, we have also concluded that each is inapposite here. As in Thomson, the record will not support a piercing of the corporate veil and, without disregarding the entity of Lubritene, it is not possible to find the direct benefit required by the estoppel cases.

Here, as in Kaplan, traditional principles of contract and agency law do not support the conclusion that the parties resisting arbitration are bound by an arbitration agreement

17

they did not sign. Accordingly, we hold that the District Court erred in compelling the Individual Appellants to arbitrate Bel-Ray's claims against them. Bel-Ray may, if it so chooses, apply to the District Court for a stay of the proceeding on those claims pending its arbitration with Lubritene.

V.

The order of the District Court compelling arbitration will be reversed and the case will be remanded to it with instructions to enter an order compelling only Lubritene to arbitrate.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit