**NATIONAL GROUP FOR COMMU-
NICATIONS AND COMPUT-
ERS LTD., Plaintiff,**

v.

**LUCENT TECHNOLOGIES
INTERNATIONAL INC.,
Defendant.**

**Civil Action No. 00–86 (JLL).**

United States District Court,
D. New Jersey.

March 1, 2004.

Michael E. Patunas, Lite Depalma Greenberg & Rivas, LLC, Newark, NJ, Donald Burke, New York, NY, LeRoy Lambert, Michael P. Smith, Healy & Ballie, New York, NY, for Plaintiff.

Richard E. Donovan, Geoffrey W. Castello, Kelley Drye & Warren LLP, Parsippany, NJ, for Defendant.

LINARES, District Judge.

Plaintiff National Group for Communications and Computers Ltd. ("NGC") filed suit against Lucent Technologies International, Inc. ("Lucent") for the alleged breach of a telecommunications construction subcontract. Because significant aspects of Plaintiff's claim hinge upon an interpretation of Saudi Arabian law, in October 2002 Magistrate Judge Hedges directed the parties to submit their respective experts' opinions on how Saudi Arabian law would construe Plaintiff's claim for damages stemming from the termination of its Projects Department as a result of the alleged contractual breach. In accordance with its September 25, 2003 Order, this Court conducted a hearing on December 15 & 17, 2003 wherein expert testimony was heard from both parties regarding the application of Saudi Arabian law to the circumstances in this case. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law regarding said hearing pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons discussed herein, this Court finds that the findings of fact and conclusions of law reached indicate that under the law of Saudi Arabia, Plaintiff is prohibited from collecting damages for the loss of its Projects Department beyond the loss in actual value of the Department's existing assets. Consistent with its previous Order, this Court reserves judgment on the precise valuation of NGC's Projects Department.

## Findings of Fact

### A. Underlying Events

As agreed by the parties, this Court has "assumed" for the purposes of the resolution of the issue now before it that Defendant breached the subcontract in dispute and that this breach caused the loss of Plaintiff's Projects Department. Therefore, the following findings of fact shall not be dispositive on the contractual issues of breach and causation, matters which will be decided at trial, but speak only to the proper award of damages under Saudi Arabian law.

On August 13, 1994, Defendant's corporate predecessor, AT & T International, Inc., entered into a $4.6 billion contract with the Saudi Arabian Ministry of Post Telephone and Telegraph (which later became the Saudi Telecom Company), a contract involving the Saudi government's sixth telecommunications project ("TEP–6"). On April 5, 1995, Plaintiff NGC, a Saudi Arabian corporation, entered into contract No. 220806 (the "Subcontract") with Defendant as part of the larger expansion project. According to the terms of the Subcontract, Plaintiff was to implement the Roadside Emergency Telephone and Wayside Facilities Projects ("RET/WSF Projects") in Saudi Arabia by performing design and engineering services and installing emergency and pay telephones along Saudi Arabia's highways and nearby facilities. The Subcontract provided for a four year contractual relationship at a fixed price of $75,460,902.

For reasons that remain disputed in the underlying litigation, and need not be resolved in the present analysis, the RET/WSF Projects were never completed and the Subcontract was ultimately terminated in the summer of 1999. As the alleged direct result of this contractual termination, Plaintiff liquidated its Projects Department during the fourth quarter of 1999. The Projects Department had been created to implement Plaintiff's telecommunications contracts, including the Subcontract. It included staff and labor under contract, offices, equipment, vehicles, and

warehouses. Soon after these events took place, the present lawsuit was filed.

### B. *Background on Valuation of Projects Department*

Beginning in August 1998, Plaintiff attempted to attract outside capital by preparing for a private placement of a portion of its equity. Plaintiff engaged Riyad Bank to act as the lead bank in this private placement and to carry out a professional valuation of NGC. Riyad Bank completed two valuations in late 1998, appraising the Projects Department at $153.0 million and $173.8 million, respectively. ("Riyad Bank Valuation Analysis," Pl.Ex. 5–7)

In the fall of 1998, Kingdom Holding Company Ltd. ("Kingdom Holding") became interested in purchasing equity in Plaintiff NGC. As part of its investigation, Kingdom Holding requested that its accountant, Arthur Andersen, review the Riyad Bank valuations and to prepare its own. Arthur Andersen completed its assessment on January 9, 1999, and valued the Projects Department at $112.3 million. On May 9, 1999, Kingdom Holding agreed to purchase 25.4% of Plaintiff company for a fixed price per share and acquired options to acquire another 15.6% at the same price. These options were never exercised. Extrapolating from this purchase price basis, the value of the entire Projects Department would be fixed at $111.7 million.

As part of this lawsuit, Plaintiff's valuation expert has determined that the value of NGC's Projects Department as of June 30, 1999 was $101,170,591. ("Decl. of R. Christopher Rosenthal", Pl.'s Exh. 1). Once discounting this amount for duplicative items of damage subsumed under other claims, the expert calculated the adjusted value of NGC's claim for loss of the Projects Department to be $92,319,579. Plaintiff's expert employed five methodologies to arrive at his ultimate valuation.

Three of these methodologies were based respectively on the two Riyad Bank valuations and the Arthur Anderson valuation. The fourth methodology, the so-called "Guideline Company Method," used data on five publicly traded companies with businesses comparable to NGC's Projects Department, and generated a valuation of $105,064,296. The fifth methodology, the "Kingdom Holding Method," was based on the price per share of NGC equity actually paid by Kingdom Holding on May 9, 1999. The valuation by Plaintiff's expert was created by applying different weights to each of these methodologies—40% to the Kingdom Holding Method, 30% to the Guideline Company Method, and 10% to each of the Riyad Bank and Arthur Andersen valuations. (R. Christopher Rosenthal, Transcript of Oral Arguments on December 15th and December 17th (hereinafter "Tr."), 30:18–23).

### Conclusions of Law

### A. *Legal Framework*

Both parties agree that the law of Saudi Arabia covers this contractual dispute. This conclusion stems from the terms of the Subcontract which include the following choice of law provision:

> This Subcontract is subject to the regulations in force in the Kingdom of Saudi Arabia. Interpretation and execution of the Subcontract and settlement of claims arising therefrom shall be subject to and in accordance with the said regulations.

(Def. Ex. 14A, Tab 3, Art. 8). Therefore, it is incumbent upon this Court to determine how Saudi Arabian law would apply to the present case, more particularly, how Saudi Arabian law would construe Plaintiff's claim for the loss of its Projects Department.

Federal Rule of Civil Procedure 44.1 governs the judicial determination of foreign law. Rule 44.1 states that when

deciding issues of foreign law, a court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." This rule provides courts with broad authority to conduct their own independent research to interpret foreign law. *Bel–Ray Co., Inc. v. Chemrite Ltd.,* 181 F.3d 435, 440 (3d Cir.1999). The court may rely upon its own research and any submissions from the parties when considering foreign law. *See Ackermann v. Levine,* 788 F.2d 830, 838 n. 7 (2d Cir.1986). In order to arrive at legal conclusions, courts may seek the aid of expert witnesses, *U.S. v. Jurado–Rodriguez,* 907 F.Supp. 568 (E.D.N.Y. 1995), extracts from foreign legal material, *Access Telecom, Inc. v. MCI Telecomm. Corp.,* 197 F.3d 694, 713 (5th Cir.1999) and may even consider material that would be inadmissible at trial. *Sidali v. I.N.S,* 107 F.3d 191, 198 n. 10 (3d Cir.1997). It is important to note that "[d]ifferences of opinion among experts on the content, applicability, or interpretation of foreign law do not create a genuine issue as to any material fact." *Banco de Credito Indus., S.A. v. Tesoreria General,* 990 F.2d 827, 838 (5th Cir.1993). In fact, "federal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities." *Curtis v. Beatrice Foods, Co.,* 481 F.Supp. 1275, 1285 (S.D.N.Y.1980). Having set forth the broad legal structure within which this Court can act when analyzing foreign law, it is now necessary to discuss the law of Saudi Arabia.

### B. *The Law of Saudi Arabia*

#### 1. *Tenets of the Shari'a*

The legal system in Saudi Arabia is fundamentally different from that of the United States. Western conceptions of the role that law plays in society, the legal process, and methods of legal interpretation, often mistakenly assumed to be universal in nature, are in many ways poles apart from those concepts in Islamic countries such as Saudi Arabia. The difficulties in understanding Islamic law are multiplied by the fact that there is a paucity of literature specifically targeted at those who, like this Court, are steeped in other legal mindsets and seek guidance as to Islamic law's interpretation. Confronted with this formidable and difficult responsibility, this Court has examined various texts and treatises dealing with Saudi Arabian law and carefully considered the testimony of the experts presented and the submissions of the parties which included testimony and submissions from Saudi Arabian lawyers, Islamic scholars, and former Saudi Arabian judges.

Based on the aforesaid considerations, it is apparent that Islam permeates every aspect of life in the Kingdom of Saudi Arabia, including its legal structure. The "Basic Regulation of the Kingdom of Saudi Arabia" states in pertinent part:

Article 1. The religion [of Saudi Arabia] is Islam, its constitution is the Book of God Most High and the Sunna of His Prophet, may God bless him and give him peace.

Article 7. Rule in the Kingdom of Saudi Arabia draws its authority from the Book of God Most High and the Sunna of His Prophet. These two are sovereign over this Regulation and all regulations of the state.

Article 48. The courts shall apply in cases brought before them the rules of the Islamic *shari'a* in agreement with the indications in the Book and the Sunna and the regulations issued by the ruler that do not contradict the Book or the Sunna.

BASIC REGULATION OF THE KINGDOM OF SAUDI ARABIA, 1992 (cited in Pl.Ex. 14, FRANK E. VOGEL, ISLAMIC LAW AND LEGAL SYSTEM, 3 (2000)).

As evidenced by its Basic Regulation, the Saudi Arabia legal system is governed exclusively by what is known as the "Shari'a," or divine law. VOGEL, ISLAMIC LAW AND LEGAL SYSTEM, 3. In fact, there are no "laws" in Saudi Arabia other than Islamic law, and any supplemental rules promulgated by the Saudi government are actually considered regulations known as "nizam." (Def. Ex. 13, Howard L. Stovall, *Doubts Persist–Arab Commercial Law into the Future, in* ARAB COMMERCIAL LAW, 8 (William M. Ballantyne and Howard L. Stovall eds., 2002)). These regulations, issued under the authority of the King after approval by the Council of Ministers, are valid only to the extent that they are consistent with Shari'a. *See* ART. 67, BASIC REGULATION OF THE KINGDOM OF SAUDI ARABIA (cited in Def. Ex. 12, WILLIAM M. BALLANTYNE, ESSAYS AND ADDRESSES ON ARAB LAWS, 59 (2000)).

The Shari'a is the product of several interrelated sources of religious authority. (Frank E. Vogel Tr. 143: 21–22; William M. Ballntyne Tr. 228:18–19; Mujahid M. Al–Sawwaf Tr. 418: 17–21). The doctrines comprising Shari'a are derived primarily from the Qur'an, the "Book of God." The Qur'an is considered the word of God as received by the Prophet Muhammed. Because the Qur'an commands adherents of Islam to obey the Prophet, the recorded examples of the acts and words of Muhammed, known as the "Sunnah," constitute an additional integral part of the Shari'a. (Vogel Tr. 143–44: 20–1). In the centuries since the founding of Islam, Islamic religious-legal scholars qualified to interpret the scriptural sources have produced opinions known as "fiqh." A complete understanding of the Shari'a in Saudi Arabia today also requires reference to any relevant fiqh for guidance. VOGEL, ISLAMIC LAW AND LEGAL SYSTEM, 5. There are four schools of Shari'a law, each of which interprets Islamic doctrine somewhat differently. The predominant school followed in the courts of Saudi Arabia is known as the "Hanbali" school. (Pl.Ex. 13, FRANK VOGEL AND SAMUEL L. HAYES, III, ISLAMIC LAW AND FINANCE, 50–51 (1998)); BALLANTYNE, ESSAYS AND ADDRESSES ON ARAB LAWS, 84.

When a Saudi Arabian judge, known as a "qadi," attempts to resolve disputes, his decision must be in accordance with the Shari'a. Therefore, he will turn to the aforementioned Qur'an, the Sunnah, and fiqh to guide his legal determination. Saudi Arabian judges are not bound by judicial precedent (in fact, Saudi Arabian judicial opinions are not published) and the concept of stare decisis does not exist. (Vogel Tr. 143:2–4; Ballantyne Tr. 260–61:25–1). Instead, judges "must strive for the divine truth for each case that confronts him, without being bound by past opinions, even his own. Truth is the ultimate precedent, to which one must return once it is revealed." VOGEL, ISLAMIC LAW AND LEGAL SYSTEM, 15. Commercial disputes, such as the one presently facing this Court, would be heard by a Saudi judge sitting on the Board of Grievances. Judicial decisions by the Board of Grievances are appealable to the Review Committee of the Board of Grievances, which may then be appealed to the King of Saudi Arabia. (Vogel Tr. 138–139; Hassan M.S. Mahassni Tr. 311:16–18; 314:1–12; 316: 5–18); VOGEL, ISLAMIC LAW AND LEGAL SYSTEM, 305.

Generally speaking, the Saudi Arabian legal structure is highly traditional and judges strictly apply classical Islamic law. In contrast to other Islamic countries that have adapted religious tenets to meet modern demands, in Saudi Arabia, Shari'a remains free of compromising reforms. (Vogel Tr. 166:14–25). The Board of

Grievances too is very conservative in its interpretation of commercial and contract law. (Vogel Tr. 163:10–11). As one author noted, "commercial jurisprudence in Saudi Arabia remains marked by a conservative fiqh orientation, reflecting the shari'a educations of the judges.... [W]henever the expectations of international commerce conflict with fixed standards of the old Hanbali law, it is the former that gives way." VOGEL, ISLAMIC LAW AND LEGAL SYSTEM, 305.

A key doctrine within the Shari'a is the prohibition on "gharar," meaning risk or uncertainty. Gharar is absolutely repugnant to Islamic law. See, e.g., Stovall, in ARAB COMMERCIAL LAW, 9. (Vogel Tr. 154–55:16–9). Future activity is deemed gharar because it is uncertain to anyone except for God. One of the consequences of this categorical rejection of gharar is that Saudi Arabian courts will not enforce the sale of anything uncertain or unknown. The object of a contract must be certain and defined and in existence. BALLANTYNE, ESSAYS AND ADDRESSES ON ARAB LAWS, 267. Several historical accounts of the acts and statements of the Prophet Muhammed, known as "hadith," are instructive on this issue:

*Do not buy fish in the sea, for it is gharar.*

*The Prophet forbade sale of what is in the wombs, sale of the contents of the udders, sale of a slave when he is runaway ...*

*The Messenger of God forbade the* [sale of] *the copulation of the stallion.*

*He who purchases food shall not sell it until he weighs it.*

Quoted in Frank E. Vogel, *The Contract Law of Islam and of the Arab Middle East, in* INTERNATIONAL ENCYCLOPEDIA OF COMPARATIVE LAW, 52 (Draft September 1, 2003).

One scholar expounded upon the implications that the prohibition of gharar has in producing differing understandings of contractual obligations under Western and Islamic law:

In English law the sanctity of contract means that the promise endures despite the normal vicissitudes of fortune. It is right that the promise should be kept 'for better or for worse', 'through thick and thin', because this in line with the popular belief that tenacity of purpose to some degree controls events and that the human will determines the future. The promise must dominate the circumstances.

For Islam precisely the converse is true. Circumstances dominate the promise. Future circumstances are neither predictable nor controllable but lie entirely in the hands of the Almighty.... If the tide of affairs turns then the promise naturally floats out with it.

BALLANTYNE, ESSAYS AND ADDRESSES ON ARAB LAWS, 274 (internal citation omitted).

■ For reasons that include the strict prohibition on anything gharar, it is often very difficult to conduct modern complex business transactions in a manner consistent with Shari'a. Consequently, other Islamic countries have enacted codes to establish sources of law other than, or in addition to, Shari'a. Lawyers often advise their clients doing business in these countries to include choice of law clauses that exclude the application of Shari'a or provisions for commercial arbitration. VOGEL AND HAYES, ISLAMIC LAW AND FINANCE, 51. The parties in this case are both knowledgeable and sophisticated business enterprises well-versed in the ways of Islamic countries and the doctrines of Islamic law. They chose not to include any prophylactic choice of law clause in this case. The parties, therefore, are subject to the full application of Shari'a, however uncompromising that application may be.

## 2. Valuation and the Recognition of Damages Under Saudi Arabian law

█ In this discussion of damages, it is important to first distinguish between the formation of a contractual agreement between parties in Saudi Arabia and the enforcement of that agreement in Saudi Arabian courts. When determining the application of foreign law to the present dispute, this Court's concern is not on the practices of consenting parties in Saudi Arabia who may have privately agreed on a given valuation or a degree of damages. Rather, the Court must ascertain what would occur when one party attempts to enforce the terms of that contract or damages claim before the Board of Grievances. This is so, because whatever parties may have privately agreed upon will not be enforced under Saudi Arabian law unless it is in accordance with Shari'a. (Ballantyne Tr. 287–88: 23–1; Vogel Tr. 169–70:14–6).

Adhering to the principles of Shari'a, when the Board of Grievances faces a breach of contract action, the quantum of damages recoverable will "fall far short of the mark which might reasonably be anticipated under English law." BALLANTYNE, ESSAYS AND ADDRESSES ON ARAB LAWS, 275 (internal citation omitted). Not only is the scope of damages recognized by the Board of Grievances much narrower than that in Western countries but also more restrictive than other Gulf States and Islamic nations. (Ballantyne Tr. 237:18–20).

█ Under Saudi Arabian law, damages for breach of contract are generally limited to those losses which are actual and direct. Damages will be awarded for actual physical harm to property caused by the breach as well as out-of-pocket losses, and can be obtained only for losses which are precise, accurate and certain. ("Declaration of Dr. Mujahid Al–Sawwaf," 5, Def. Ex. 15). Conversely, because of the principle of gharar, Saudi law does not permit damages that are "ascertainable only by means involving speculation, contingencies, uncertainties or indeterminancy." (Vogel Tr. 177:1–6). Accordingly, the Board will not permit the recovery of expectation damages. Vogel, *The Contract Law of Islam and of the Arab Middle East*, 121. Indeed, as Plaintiff's expert himself has written:

> Losses to expectancy (beyond actual sustained injuries) are by definition fictional, based on the counter-factual premise that the contract was carried through without a breach. If damages are to include these undetermined contingencies, then either the parties did not consent to bear them or they consented to extreme gharar. On a theological plane, they assign to parties a God-like role to predict fate, and to be held to account for failures to do so.

Vogel, *The Contract Law of Islam and of the Arab Middle East*, 131. Gharar threatens to invalidate a contract irregardless of the degree of risk actually involved, and even if one of the parties has explicitly assumed the contractual risk and had been compensated accordingly. VOGEL AND HAYES, ISLAMIC LAW AND FINANCE, 91.

█ Saudi law also denies any recovery for unrealized gains or future profits lost due to contractual default because of their speculative nature. Vogel, *The Contract Law of Islam and of the Arab Middle East*, 132; VOGEL AND HAYES, ISLAMIC LAW AND FINANCE, 51. *See also* BALLANTYNE, ESSAYS AND ADDRESSES ON ARAB LAWS, 274–275 ("Calculation of damages never takes into account anticipated profit because this is a future and unknown quantity.") For similar reasons, recovery is not permitted in Saudi courts for those damages based on intangible notions such as the loss of goodwill because they are inherently uncertain. (Al–Sawwaf Tr. 409:22–25; Ballantyne Tr. 245:17–23).

Based on this understanding of contractual damages, a Saudi judge, for example, would not enforce a transaction for the sale of a pregnant camel if that transaction afforded a higher price due to the camel's pregnancy. This is because the future pregnancy is gharar; it may not in fact occur, and therefore the value is imbued with an unacceptable risk. If the Court were awarding damages according to Shari'a, it would not take notice of the pregnancy because that would be a future expectation. (Ballantyne Tr. 242:20–23). Likewise, the likelihood that a race horse will earn prize money in the future is gharar and would not be taken into account in awarding damages for the horse's destruction. According to the Shari'a, only God knows whether the horse would in fact win anything in the future or whether God would disfavor the owner of the race horse in the future. (Ballantyne Tr. 283:7–10; Al–Sawwaf Tr. 415: 5–19).

■ These zoological metaphors are not the only examples of the restriction on the award of uncertain damages. In construction contracts in which the contractor sues the work owner for breach of contract, one scholar has noted that damages are limited to "actual performance costs 'lost' due to the breach." Vogel, *The Contract Law of Islam and of the Arab Middle East*, at 130–31, n. 239. Such "actual performance costs" refers to money paid out for workers, the costs of equipment or facilities, and other out-of-pocket damage. (Vogel Tr. 199–200:22–1).

In the case at bar, Plaintiff's expert seems to concede that courts will not enforce a greater valuation based on future expectations. (Mahassni Tr. 361:17–23). Plaintiff advances the argument that higher valuations are possible as long as the future event is not an explicit condition to the contract (Vogel Tr. 157:3–23), and that uncertainty that is subsumed within a larger entity, such as a corporation, would be upheld, and it is only when gharar inheres within a separate entity is it forbidden. (Vogel Tr. 181:11–23). These arguments lack meaningful supporting religious, academic or legal authority, and appear to draw too tenuous a distinction to be acceptable. This Court does not accept the suggestion that the conservative highly-religious Saudi Arabian courts would find significance in superficial differences in the presentation of gharar sufficient to overcome the dictates of the Shari'a.

### C. Application of Saudi Arabian Law on Damages to the Projects Department

■ Assuming it can eventually prove breach and causation, Plaintiff seeks recovery for the full value of its liquidated Projects Department which has been valued by its expert at $92,319,579. Because such a damages award runs contrary to Shari'a law as said law would be interpreted by the Board of Grievances, the Court rejects this claim and limits damages to the loss in value of Plaintiff's actual assets.

A review of the methods used by Plaintiff's valuation expert shows that they all contain unacceptable elements of gharar, thereby precluding their acceptance under Islamic law. The two Riyad Bank valuations and the Arthur Andersen valuation used by Plaintiff's expert rest almost entirely on projections into the future. These three valuations used the "discounted cash flow" method of valuation. By definition, use of the discounted cash flow method requires future predictions which are then discounted to derive a present valuation. Plaintiff's expert conceded as much at trial. (Rosenthal Tr. 69:2–3 ("Using the discounted cash flow methodology by definition projects into the future.")) A company's cash flow is based in part "upon what [the company] might expect to be able to do in the future" and takes into account "projects that they expected to

have in the future." (Rosenthal Tr. 26:6–8). This analysis requires future estimates of, among other things, revenues, costs, debts and capital expenditures.

Indeed, the different Riyad Bank valuations arise from running discounted cash flow projections under two different scenarios (a conservative and best case scenarios), each of which was based upon different probabilities that NGC would obtain future contracts. Likewise, Arthur Andersen stated that only 20% of its estimate of the value of Plaintiff's business was based on presently-held contracts, compared to 80% which was based on future contracts. (Vincent O'Brien Tr. 90:10–17; 1116–17: 23–16). The fact that none of the testifying experts had ever heard of any case in which the Board of Grievances awarded damages for the value of a business based on this method of valuation lends support to this Court's conclusion. Although the discounted cash flow approach serves as a useful tool to aid in business transactions in Western countries, it would be unacceptable to a court in Saudi Arabia that is faithful to Islamic doctrine.

The Guideline Company Method of valuation likewise conflicts with the Saudi Arabian aversion to gharar. Under this approach, Plaintiff's expert used five publicly-traded companies with operating and financial characteristics similar to NGC's Projects Department to determine its value. However, the value of the stocks in these "guideline companies" are inevitably future oriented, based on an implicit projection of future cash flows by investors. (O'Brien Tr. 91:14–16). To the extent the value of a share depends on estimated future earnings, it would be excluded from a damages claim. (Ballantyne Tr. 285:19–21). Basic economic doctrine holds that the price of a stock is "the present value of the future dividends out to infinity" (O'Brien Tr. 92:1–2). The "value of any asset is a function of the cash flows generated by that asset, the life of the asset, the expected growth in cash flows, and the riskiness associated with them." (Def. Ex. 4, "Expert Report of Dr. Vincent O'Brien," 3, quoting from CORPORATE FINANCE, THEORY AND PRACTICE, 750) (2nd ed., Aswath Damodaran, John Wiley & Sons (2001)). Consequently, this methodology is likewise offensive to Shari'a principles in Saudi Arabia.[1]

Plaintiff contends that if the Court were to reject the Guideline Company Method, that rejection would imply that no one in Saudi Arabia could enforce a contract to buy or sell shares of stock in a company to the extent the price did not reflect the tangible value alone of that company's assets. This may very well be the case. However, it is neither the province nor duty of this Court to comment upon the wisdom or practicality of the strict application of Shari'a or bemoan the potential troubling ramifications that Shari'a might have on the ability to conduct complex business transactions in Saudi Arabia. To paraphrase the great Chief Justice John Marshall, this Court's mandate is only "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 177, 2 L.Ed. 60 (1803). And based on the research as outlined above, coupled with the inability of any expert to point to any case in which the Board of Grievances ever used something akin to the Guideline Company Method to value a company for damages determination, this Court finds that Shari'a law would not allow for this approach.

---

1. Plaintiff's statements that companies in Saudi Arabia are often valued on this basis does not mean that were the matter to be litigated in Saudi Arabia a Saudi Arabian court would indeed enforce that valuation and award damages.

The fifth method used to value Plaintiff's Projects Department, the Kingdom Holding Method, suffers from similar infirmities. This valuation is based on the May 9, 1999 agreement by Kingdom Holding Company Ltd. to purchase a portion of Plaintiff company for a fixed price per share. This purchase price was then used as a basis from which to extrapolate the value of the entire Projects Department. Putting the potential substantive weaknesses of this approach aside,[2] this approach is problematic first because both parties in the transaction used the troublesome Riyad Bank and the Arthur Andersen discounted cash flow methods to structure their negotiations. (O'Brien Tr. 96:6–8). In addition, this approach is clearly based on Kingdom Holding's expectations of future return, a projection that of course cannot be predicted with certainty and would be invalidated because it is gharar. Furthermore, at least one expert has suggested that the doctrine of "taqualub al asaar," (meaning "changing of prices") would preclude consideration of the Kingdom Holding Method by a Shari'a judge. Under this principle, a judge should not base a valuation of complex entities such as a company on offers by bidders or other purchasers. This is because offers may change based on numerous extraneous circumstances, and different people have particular subjective motivations for purchasing an object which cannot be generalized to derive a uniform "proper" valuation. (Def. Ex. 15, "Declaration of Dr. Mujahid M. Al-Sawwaf,7; Al-Sawwaf Tr. 423:9–25").

Plaintiff attempts to sidestep the dictates of Shari'a by characterizing its claim as one for the loss in the "present actual value" of the Projects Department rather than one for lost future gains. However, Plaintiff's expert himself admitted that "trying to recover lost gains by reproducing them or representing them as a direct reduction in value ... would be improper under Islamic law." (Vogel Tr. 197: 4–7). The loss in a company's value is directly dependent on, and intertwined with, the loss of its future earnings. If a Saudi court would deny damages based on the latter because of its inconsistency with Islamic law, it would certainly also deny damages based on the former. Permitting Plaintiff to evade the ban on gharar by reframing its claim as a loss in present value would produce an exception that would soon swallow the rule, as most future claims have some present element to them. The Board of Grievances has not and would not permit this back-door approach to obtaining damages that is effectively identical to a forbidden claim for lost future earnings.

The $92 million valuation by Plaintiff's expert is also suspect because the figure includes intangibles beyond future contracts, such as goodwill, that are not allowed under the Shari'a. (Al–Sawwaf Tr. 411:7–12). Plaintiff's own expert, who practiced law in Saudi Arabia for almost 40 years, testified that he never heard of a case in which the Board of Grievances awarded damages based on the destruction of an intangible piece of property. Plaintiff's discussion of "mithli" (fungible property) and "qimi" (non-fungible property) does not change this Court's conclusion. (Ballantyne Tr. 275: 18–22). It may very well be true that the amount of compensation for qimi such as a company is the actual market value of the item, a valua-

---

**2.** Kingdom Holding has since accused Plaintiff NGC of substantially overstating its historical net worth, believing that it overpaid for this portion of the company. (*See* Rosenthal Tr. 75:10–14). Moreover, the Kingdom Hold-

ing purchase price appears to be based on the purchase of the entire NGC company and not just the Projects Department. It is unclear how much of that purchase price can be attributed to the Projects Department.

tion in which the Board of Grievances may reach by relying upon the opinions of accounting experts. (Mahassni Tr. 327:22–24; 332: 5–9). However, this assertion does not take away from the undisputed notion that the presence of gharar would still invalidate any such valuation.

Consequently, it is clear to this Court that in Saudi Arabia, the Board of Grievances would not award damages based on Plaintiff's valuation of the Projects Department. To do so would be equivalent to placing a value on fish in the sea, or purchasing food that has not yet been weighed. Although Plaintiff's valuation is rejected, this does not mean that Plaintiff cannot recover damages for its losses. However, the measure for the loss of the Projects Department must be limited to the actual existing assets of the Department, and not to those items impinged with gharar. Moreover, the amount obtainable will be measured by the fair market value of the assets and not their book value, as book value is an accounting convention that would not produce an accurate picture of actual losses as defined under Islamic law.

### Conclusion

In conclusion, it is the holding of this Court that Plaintiff's valuation for the Projects Department must be rejected. This conclusion is based upon this Court's review of various academic texts, the testimony of the experts, the submissions of the parties, and the Court's understanding of the fundamental principles of Islamic law as they would be interpreted by a court in Saudi Arabia.

It is so ordered.