# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SARA HILDEGARD ENSING, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 12591- VCS** |
| | : | |
| HANS ENSING and | : | |
| OIGGOL HOLDING, LLC, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| INTERNATIONAL WINE CAPITAL | : | |
| PARTNERS, LLC; | : | |
| LOGGIO FINANCE, LLC, | : | |
| | : | |
| Nominal Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: January 30, 2017
Date Decided: March 6, 2017

David J. Teklits, Esquire and D. McKinley Measley, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and Michael H. Johnson, Esquire and William G. Somerville, Esquire of Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. of Birmingham, Alabama, Attorneys for Plaintiffs.

Daniel K. Astin, Esquire, John D. McLaughlin, Jr., Esquire, and Joseph J. McMahon, Jr, Esquire of Ciardi & Astin, Wilmington, Delaware, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

A husband and wife, Dr. Hans Ensing ("Hans") and Sara Ensing ("Sara"),[1] made the dream of many a reality: they acquired a picturesque vineyard in Italy and moved there with their two children to operate a winery and boutique hotel on the property. The businesses operate indirectly through two Delaware limited liability companies. Prior to the events that precipitated this litigation, Sara was a manager and member of one of the entities and, through that entity, was manager of the other. Hans was neither a member nor manager of either entity.

Sadly, the marriage has ended bitterly. When Hans purported to remove Sara and appoint himself as manager of one of the entities, and then engage in a series of transactions intended to divest Sara of her interests in the winery and hotel, Sara initiated this action pursuant to 6 *Del. C.* §§ 18-110 and 18-111 to obtain declarations regarding the rightful owners and managers of the entities.

The matter was litigated as a summary proceeding and tried over two days. During the litigation, Hans ignored his discovery obligations, violated court orders, submitted evidence of suspect (at best) authenticity and generally engaged in bad faith litigation conduct. In contrast, Sara presented a straightforward case. According to Sara, the controlling operating agreements of the entities in question afford no rights to Hans, either as member, manager or otherwise. Thus, he had no

---

[1] I use first names for the sake of clarity. I intend no disrespect to either party.

authority to engage in any conduct with respect to the entities without her consent. And because she did not give consent for Hans to seize control of either entity, or to effect any changes at the winery or the hotel, Sara maintains that she is entitled to declaratory judgments that Hans' actions are null and void as a matter of law.

After carefully reviewing the evidence, I conclude that Sara has carried her burden of proving that Hans had no authority to remove her as manager of the entities, to appoint himself as manager of the entities or to transfer membership units of one of the entities to an entity under his control. Accordingly, I will enter each of the declaratory judgments Sara has requested in her Verified Complaint. I also conclude that Hans has engaged in blatant violations of court orders and bad faith litigation conduct that justify serious sanctions. My reasons follow.

## I. BACKGROUND

I have drawn the facts from the testimony and exhibits presented during trial and from reasonable inferences that flow from that evidence. I have also relied upon the stipulations of fact the parties entered in advance of the trial.

## A. The Parties and Related Entities

Sara and Hans married in Amsterdam in 2002. They are now legally separated and engaged in bitter divorce proceedings in Italy. Two sons were born of the marriage, ages nine and thirteen years old (together, the "Minor Children").[2]

During happier times, in 2012, Hans and Sara moved to Italy to operate a vineyard and winery named Villa Loggio.[3] The winery sells wine throughout Europe.[4] They opened a boutique hotel co-located with the winery in 2014. By all accounts, the hotel is quite successful, attracting guests from approximately 50 different nationalities.[5]

International Wine Capital Partners, LLC ("IWCP") was formed in April 2012.[6] It is a manager-managed Delaware limited liability company with three members—Sara and the two Minor Children (collectively, the "Members").[7] Each

---

[2] Trial Tr. ("Tr.") 12–13.

[3] *Id.* 40.

[4] *Id.* 16–17, 20.

[5] *Id.* 15, 18.

[6] Pre-Trial Stip. and Order ("PTO") at 4; JX 6.

[7] *Id.*

3

member holds 50 units of IWCP.[8] At the time of its formation, Sara's brother, Fidelis Rainer Süttman, was designated as manager of IWCP.[9]

IWCP's stated purpose was to serve "as an investment holding company."[10] When it was formed, it owned 100% of the shares of *Società Agricola Villa Loggio srl* ("S.A. Villa Loggio"), an Italian entity which owns the winery, vineyard and other related assets.[11] As of the spring of 2016, S.A. Villa Loggio had three board members: Hans, as managing director, his father, Geert Ensing, as president, and Sara as consigliere.[12]

Loggio Finance LLC ("Loggio") was formed in May 2012 with IWCP as its sole member.[13] In July 2012, IWCP pledged 70% of its interest in S.A. Villa Loggio to Loggio, leaving IWCP with a 30% interest in S.A. Villa Loggio.[14]

---

[8] *Id.*

[9] Tr. 30.

[10] JX 7 at § 2.04.

[11] JX 10.

[12] Tr. 43.

[13] PTO at 5.

[14] *Id.;* Tr. 21.

4

In December 2013, the members of IWCP appointed Sara as Manager of IWCP.[15] In accordance with Loggio's Operating Agreement, on December 9, 2013, IWCP appointed Sara as manager of Loggio.[16] Thus, as of the end of 2013, Sara served as manager of both IWCP and Loggio. Hans was neither manager nor member of either entity.

The opening recital of the IWCP Operating Agreement designates Sara as guardian of the Minor Children for purposes of representing their interests in IWCP.[17] In this capacity, Sara executed the IWCP Operating Agreement on behalf of the Minor Children and thereafter executed every other entity-related instrument on their behalf as well, including the First Amendment to the Operating Agreement and a December 2013 unanimous consent document.[18] Hans expressly consented to Sara's actions as guardian for the Minor Children in February 2014, as reflected in a written consent executed before a Notary in Germany.[19]

---

[15] PTO at 4–5.

[16] *Id.*

[17] JX 7.

[18] *Id.*; JX 24; PTO at 4.

[19] *Id.* ("I agree with all declarations of Sara . . . which she has made as guardian of [the Minor Children] on behalf of International Wine Capital Partners.").

5

**B. Sara and Hans Separate and Hans Attempts to Seize Control of the Winery and Hotel**

Sara and Hans separated in April 2015 and Hans soon after moved out of the family residence at Villa Loggio.[20] The split of the marriage marked the end of Sara and Hans' collaboration with respect to the operations of Villa Loggio.[21] Sara was in residence and was handling the day-to-day operations of the winery and hotel.[22] From her perspective, Hans had begun to undermine her efforts by refusing to oversee operations in the vineyards and by interfering with the hotel's on-line booking platforms.[23] This often left the hotel staff guessing about when guests would arrive, how long they would stay and the rate they had committed to pay on the booking platform they utilized to book their stay.[24]

Believing she was acting "for the well being of [S.A. Villa Loggio]" as consigliere, Sara asked Geert Ensing to convene a special board meeting of S.A. Villa Loggio on May 6, 2016, where she would propose changes to the composition

---

[20] Tr. 40–41.

[21] *Id.* 42.

[22] *Id.* 42–44.

[23] *Id.*

[24] *Id.*

6

of its board of directors.[25]  Geert took no action.[26]  Fearing that her inaction would be deemed acquiescence, on the advice of counsel, Sara advised Geert by formal notices that, as manager of both entities, she would convene a special meeting S.A. Villa Loggio's shareholders (IWCP and Loggio) on June 9, 2016, for the purpose of changing the composition of S.A. Villa Loggio's board of directors.[27]

These notices sparked a flurry of activity by Hans.[28]  First, on May 30, 2016, Hans emailed Sara to advise her that he was activating a "Pledge of Shares and Voting Agreement" (the "Pledge Agreement") between an entity called Villa Loggio Finance BV and Loggio which purported to allow Villa Loggio Finance BV to appoint Loggio's management.[29]  The Pledge Agreement purports to be executed by Hans on behalf of Loggio Finance BV and Sara on behalf of Loggio.[30]  Second, also on May 30, Hans executed a document entitled "INTERNATIONAL WINE CAPITAL PARTNERS (IWCP) LLC: Action by Consent in Writing of the

---

[25] *Id.* 44–46; JX 61.

[26] *Id.*

[27] *Id.*; Tr. 203.

[28] Tr. 295 ("At that time, I [Hans] realized what she [Sara] was trying to do").

[29] JX 73 (Hans' email); JX 22 (Pledge Agreement); Tr. 295–96.

[30] JX 22.

7

Members," pursuant to which he was elected as manager of IWCP.[31]  He signed the document as Manager and as guardian of the Minor Children.[32]

Sara convened the special shareholders meeting of S.A. Villa Loggio on June 9, 2016 as noticed.[33]  Neither Hans nor Geert attended.[34]  Acting on behalf of IWCP and Loggio, Sara removed Hans and Geert as directors and elected herself as managing director.[35]

On June 15, 2016, Sara received an email from a Thomas Hunt who purported to be an accountant acting on behalf of Hans.[36]  Mr. Hunt's email attached a "Trust Agreement" and a "Share Purchase Agreement" that he claimed to have received from Hans' lawyer in 2012.[37]  The Trust Agreement, purportedly executed by Hans and Sara, allows Hans to appoint the management of IWCP.[38]

---

[31] JX 75.

[32] *Id.*

[33] Tr. 64, 203.

[34] Tr. 203–04.

[35] *Id.*; Tr. 64.

[36] Tr. 66–67; JX 102.

[37] *Id.*

[38] JX 4.

Seven days later, Hans, ostensibly acting as manager of IWCP and Loggio, executed a Board Resolution for Loggio in which Loggio agreed to "sell all or substantially all" of its 70% interest in S.A. Villa Loggio to a Delaware limited liability company, Oiggol Holdings, LLC ("Oiggol"), of which he is the manager and his girlfriend, Jelena Reinhardt, is the sole member.[39] Two days later, Loggio and Oiggol entered into an Agreement of Sale pursuant to which Loggio sold its 70% interest in S.A. Villa Loggio to Oiggol for €420,000.[40] In order to complete the transaction and file papers reflecting the transfer of interest, Hans was required to submit proof of payment to an Italian notary. He did so by supplying a receipt from Commerzbank which purported to evidence a transfer of the €420,000 to a joint account in his and Sara's name.[41] At trial, Hans acknowledged that the transfer never actually happened.[42]

Hans then turned his focus back to IWCP. On June 25, 2016, purportedly acting as guardian of the Minor Children, Hans sent a notice to IWCP of a "special meeting of the members of [IWCP]" to be convened on July 8, 2016.[43] He sent the

---

[39] JX 116; PTO at 5; Tr. 41.

[40] *Id.*; JX 136.

[41] Tr. 99–101; JX 134.

[42] Tr. 362.

[43] JX 124.

notice of the meeting to IWCP's registered agent in Delaware; he did not send notice to Sara.[44] Having not received notice of the July 8 meeting, Sara did not attend.[45] The minutes of the meeting, which Hans sent to Sara on July 14, reveal that Hans, acting as guardian of the Minor Children, removed Sara as manager of IWCP and Loggio and appointed himself as manager of both entities.[46] He then directed that 350 newly-issued IWCP units be "granted" to Oiggol and that Loggio be "disinvest[ed]" to Oiggol, thereby making Oiggol the majority member of IWCP.[47]

Hans was not finished. On July 19, 2016, he emailed the members of the board of directors of S.A. Villa Loggio and advised them that Oiggol now owned 70% of S.A. Villa Loggio and would exercise its "voting rights" to undo whatever Sara had purported to do during the June 9 meeting of the S.A. Villa Loggio shareholders, including the removal and replacement of its board of directors.[48]

---

[44] *Id.*; Tr. 300–303.

[45] Tr. 82, 115; JX 153.

[46] JX 156.

[47] *Id.*

[48] JX 158.

## C. Sara Initiates This Litigation

Sara filed her Verified Complaint in this Court on July 22, 2016, along with a motion to expedite and a motion for a status quo order. The Court granted both motions and the parties began expedited discovery.

### 1. Hans Stakes His Litigation Position

In her written discovery responses, and at her deposition, Sara denied ever having seen or signed either the Pledge Agreement or the Trust Agreement and thereby placed the authenticity of both documents squarely at issue. In his opposition to Sara's motion for a status quo order, Hans maintained that he was authorized to remove Sara as manager of IWCP and Loggio, and to transfer ownership interests to Oiggol, in part based on the Trust Agreement and the Pledge Agreement.[49] At a hearing on August 1, 2016, counsel for Hans alleged that, based on the disputed documents, Sara "actually stands in a fiduciary role to Hans," that she was "the nominee of Hans," and that "the bottom line is [Sara is] acting as his fiduciary, as his trustee, his nominee, and quite frankly, needs to do what he tells her to, and if she doesn't, he's within his rights to remove her."[50] In response to Sara's claims that the documents were "forgeries," Hans wrote to the Court on August 2,

---

[49] Prelim. Objection to Mot. for Status Quo Order ¶¶ 3–4.

[50] Teleconference Pl.'s Mot. for Status Quo Order at 12–14.

2016, to advise that he intended to have "certified copies" of the documents "prepared at the U. S. Embassy in Rome[.]"[51]  That never happened.

During his deposition on October 6, 2016, Hans doubled-down.  He explained that a lawyer and an accountant, Remco Vermeer and Thomas Hunt, respectively, had been instrumental in forming and structuring IWCP and Loggio.  He confirmed that Thomas Hunt had sent the email to Sara four months prior, on June 15, 2016, along with the Trust Agreement.  He also confirmed that the Trust Agreement was a principal basis upon which he had removed Sara as manager of IWCP.[52]  Yet he could not produce the originals of either of the disputed documents.  When pressed to provide more information about Mr. Hunt, Hans shut down.  He was unable to provide any contact information or even to provide Mr. Hunt's nationality.[53]  Hans followed up after his deposition with a street address for Mr. Hunt and Mr. Vermeer but an investigation of the address revealed that neither of them maintained offices in the building that was located there.[54]

Hans refused to provide any further contact information for Hunt or Vermeer in response to supplemental discovery requests from Sara and also refused to turn

---

[51] Transmittal Letter for Copies of Documents (Transaction ID 59361461).

[52] Hans Dep. 235**:**14–19.

[53] *Id.* 57:2–3; 62:6–9.

[54] Tr. 123.

over the devices on which he testified that he had created and stored the Pledge and Trust Agreements. Sara moved to compel. The Court granted the motion on November 29, 2016, and directed Hans to deliver certain computers, drives and other electronic storage devices to a third-party vendor by December 6, 2016, so that a search for information relating to Hunt and Vermeer, and the Trust Agreement and Pledge Agreement, could be performed.[55] Hans ignored the Court's order. Accordingly, Sara filed a motion asking the Court to draw an adverse inference against Hans with respect to the Trust Agreement and the Pledge Agreement. The Court granted that motion as well and entered the following order:

> At the trial of this matter, the Court will operate under the inference that the subject trust agreement and the pledge agreement (the "Agreements") are not authentic. At trial, the burden will be on Dr. Ensing to prove that the Agreements are authentic.[56]

With only two weeks left before trial, there appeared to be little time left for Hans to further attempt to undermine the litigation process. Unfortunately, two weeks provided ample time for more misbehavior.

---

[55] Order for Delivery and Analysis of Electronic Devices (Transaction ID 59886498) (Nov. 29, 2016). The Court also granted a motion to compel a second deposition of Hans since he produced a cache of documents for the first time at his first deposition. *Id.*

[56] Order Regarding Pl.'s Mot. for Adverse Inference (Transaction ID 59981863) (Dec. 21, 2016).

13

### 2. Hans Continues to Press the Trust and Pledge Agreements, Violates the Status Quo Order and Files a Misleading Motion to Continue the Trial

The two weeks leading up to the trial, as would be expected, were quite busy for the parties and the Court. The parties submitted pretrial briefs and a pretrial stipulation as anticipated in the trial scheduling order. Unfortunately, Hans generated additional litigation by violating the status quo order and then seeking an eleventh-hour continuance of the trial under false pretenses. Sara, of course, was forced to respond.

### a. Hans Relies Upon the Trust and Pledge Agreements in His Pretrial Brief

The parties filed simultaneous pretrial briefs on December 9, 2016. For his part, Hans continued to maintain that Sara's interest in Villa Loggio was subject to a suite of agreements between the parties that included the Operating Agreement, Trust Agreement and Pledge Agreement. He argued that "Sara's one-third interest [in IWCP] was a naked legal interest and was held by her as a trustee for Hans pursuant to the Trust Agreement."[57] He later argued that he maintained the right to "direct [Sara's] actions" in IWCP pursuant to the Trust Agreement and that the Pledge Agreement allowed him (indirectly through Loggio Finance BV) "to select the management" of Loggio.[58] He "vehemently denie[d]" that the documents were

---

[57] Defs.' Pre-Trial Opening Br. 3.

[58] *Id.* 7.

not what they "purport[ed] to be on [their] face."[59]  This, in part, prompted Sara to include in the pretrial stipulation a prayer for attorney's fees, costs and expenses for bad faith litigation conduct.[60]

### b. Hans Violates the Status Quo Order

As is typical in control contests, the Court entered a status quo order at the outset of the litigation that prohibited both parties from taking extraordinary steps that would fundamentally change or disrupt the business of Villa Loggio.  In the days leading up to trial, Sara discovered that Hans had been taking actions that threatened to interfere with her operation of the hotel.[61]   Specifically, Hans made unauthorized contact with several booking platforms that the hotel relied upon to book guests and informed them that an entity controlled by him and his father (Scorpius) would be in control of Villa Loggio on January 1, 2017.  He advised these booking platforms that they should no longer deal with Sara.[62]   As proof of his alleged control of Villa Loggio, Hans forwarded copies of a power of attorney from Scorpius granting him authority to act on its behalf, a copy of the filed shareholder composition of S.A. Villa Loggio showing Oiggol's majority shareholder status and

---

[59] *Id.*

[60] PTO at §§ III.A.9, IV.A.2.

[61] Pl.'s Mot. to Enforce Status Quo Order (Transaction ID 59928111) (Dec. 7, 2016).

[62] Tr. 142–146.

a copy of the purported share transfer agreement between Loggio and Oiggol.[63]

Hans persisted in his interference until Sara moved to compel him to comply with the Status Quo Order, which the Court ultimately granted.[64]

### c. Hans Seeks to Continue the Trial Under False Pretenses

One week before trial, on December 12, 2016, Hans moved to continue the trial and to postpone his second court-ordered deposition on the ground that he could not travel to the United States because he did not have a valid passport.[65] According to Hans, he had applied to renew his Dutch passport but the passport had not yet arrived as of the date of his motion (or it had been sent to a wrong address). In response to the motion, Sara's counsel contacted the Dutch Consulate to determine the status of Hans' passport application and learned that the passport was available to be picked up by Hans as early as December 2 and had, in fact, been delivered to an address in Cortona, Italy (where Hans resides) on December 12. It was signed for by a "H. Ensing."[66] Of course, Hans did not provide this update to the Court after filing his motion; the Court learned that he had actually received his passport

---

[63] *Id.*

[64] Tr. 517–20. The Court's order apparently was not sufficient to get Hans' attention as Sara discovered that Hans was continuing to violate the Status Quo order after trial, prompting a second motion to compel compliance. The Court granted this motion as well. (Transaction ID 60162594).

[65] Defs.' Mot. for Continuance.

[66] Response in Opp'n to Defs.' Mot. for Continuance.

16

when the motion for a continuance was presented to the Court on December 14.[67] Remarkably, Hans still pressed for a trial continuance.[68] The motion was denied.[69] Hans was ordered to appear for trial and to sit for his second deposition on the eve of trial.[70]

### 3. Hans Seeks to Distance Himself From the Trust and Pledge Agreements on the Eve of Trial

The first hint that Hans would abandon his reliance upon the Trust and Pledge Agreements came in the Pretrial Order where Hans listed as the only issue to be litigated at trial "[w]hether Dr. Hans Ensing as parent and natural guardian of [the Minor Children] may vote his childrens' membership interests in IWCP to remove and replace the sole manager?"[71] At the outset of the trial, counsel for Hans advised the Court for the first time that Hans no longer would be relying upon the Trust Agreement.[72] Sara responded by arguing that the Court should receive evidence

---

[67] Teleconference Mot. for Continuance (Transaction ID 60194042) (Dec. 14, 2016).

[68] *Id.*

[69] *Id.*

[70] *Id.* Trial was held on December 20 and December 21, 2016, and Hans appeared as directed.

[71] PTO at § III.B.1.

[72] Tr. 3, 5–8.

regarding the Trust Agreement's authenticity, nevertheless, in support of her claim for attorney's fees. The Court agreed.[73]

For reasons that remain unclear, Hans did not profess to abandon his reliance upon the Pledge Agreement at any time during the trial. Instead, Hans waited until he filed his opening post-trial brief to advise the Court and Sara that he would no longer rely upon the Pledge Agreement and instead would rest his defense of Sara's claims solely upon his right as guardian of the Minor Children to vote their interests in IWCP.[74]

### 4. Sara Presents Evidence Regarding the Unreliability of the Trust and Pledge Agreements

Sara testified unequivocally at trial that she had never seen or signed the Pledge Agreement or the Trust Agreement.[75] And even though Hans had begun to distance himself from these documents by the time of trial, they were relevant to Sara's allegations that Hans' testimony was not credible and to her claim for sanctions. Sara presented compelling evidence that the documents were not what Hans represented them to be.

---

[73] *Id.*

[74] Defs.' Post-Trial Opening Br. 7.

[75] Tr. 51–52, 67–68.

### a. The Pledge Agreement

Sara began her attack on the authenticity of the Pledge Agreement by explaining that a company stamp that appeared over her purported signature on the document was actually created in 2015, long after the 2012 date on which the document was purportedly executed.[76] Moreover, she explained that she was not appointed manager of Loggio until December 2013 so she had no authority to execute the Pledge Agreement on its behalf in 2012.[77]

Sara then presented the testimony of a computer forensics expert, James Broidy, who testified that metadata on the PDF version of the Pledge Agreement that Hans had emailed to Sara showed that Hans had created it on May 27, 2016, using a Mac operating system that was released by Apple in January 2015.[78] According to Mr. Broidy, the metadata revealed that three versions of the document should exist: the original from which the PDF was created, the digital copy of the scanned original and a version that was saved in "Preview mode."[79] Of course, Hans produced none of these versions despite being ordered to do so. And because Hans refused to produce the devices on which the document was created and stored, no

---

[76] Tr. 53–55, 58–61; JX 44; JX 73

[77] Tr. 63; PTO at 4.

[78] Tr. 436–38; JX 198.

[79] Tr. 442–444, 506–08.

further forensic examination could be performed to pin down precisely when the original document was created.[80]

For his part, Hans was not able meaningfully to rebut Sara's evidence regarding the 2015 stamp that mysteriously appeared on a document she allegedly signed in 2012.[81] Nor was he able convincingly to account for the original, answer Sara's testimony that she never saw much less signed the document or respond to the expert's testimony regarding the timing of the creation of the PDF attached to the email he sent to Sara (while still maintaining that he cannot produce the original document). Even without the adverse inference, which was well-earned by Hans' blatant refusal to comply with a Court order, the evidence overwhelmingly points to the conclusion that Hans relied upon and introduced into this litigation a Pledge Agreement that was not authentic.

### b. The Trust Agreement

The trial evidence revealed that on June 15, 2016, a person claiming to be Thomas Hunt, using the email address thomas.hunt@accountant.com, emailed Sara a copy of the Trust Agreement, which purports to give Hans the authority to appoint the manager of IWCP.[82] According to Hans, he and his lawyers drafted the Trust

---

[80] Tr. 444.

[81] Tr. 331–336.

[82] JX 4; JX 103.

20

Agreement in April 2012 prior to IWCP's formation.[83]  As noted, Mr. Hunt has not appeared as a witness in this litigation and, despite the fact that the man served as his trusted advisor, Hans has no way of contacting him either.[84]  Sara, of course, testified that she had never met or heard of Thomas Hunt and had no idea who he was.[85]

Mr. Broidy studied both the Hunt email and the Trust Agreement attached to it.  As for the email, Mr. Broidy explained that the "accountant.com" email address utilized by Hunt was not nearly as impressive as it appeared.  Such addresses are available to anyone who signs up with "mail.com"—there is no need to verify one's status as an accountant and the process of securing the address takes all of "a few minutes."[86]  Utilizing forensic software that allows him to extract data from received emails, Mr. Broidy was able to discover that emails sent to Sara from Hans and Thomas Hunt came from the same IP address meaning that the emails were "either being sent from different accounts that are in the same physical location, like under one roof, or the same device."[87]  This, in turn, caused Mr. Broidy to conclude either

---

[83] Tr. 349–50.

[84] Tr. 392.

[85] Tr. 48-50, 121–24.

[86] Tr. 420–22.

[87] Tr. 429–33; JX 198.

that Hans and Hunt were together at the time the June 15, 2016 email (with the Trust Agreement) was sent or that one user (presumably Hans) logged in and created an accountant.com email address on behalf of Thomas Hunt and then sent the emails to Sara.[88]  Given that Hans testified he had not seen Hunt since 2012 or 2013,[89] it appears more likely that Hans fabricated Hunt's involvement as a ploy to convince Sara that she was outgunned and should capitulate to Hans' demand that she step away from IWCP, Loggio and Villa Loggio.

The metadata from the Trust Agreement revealed that, like the Pledge Agreement, the Trust Agreement PDF was created on June 15, 2016, and then emailed to Sara thirty minutes later.[90]  Mr. Broidy testified that it is most likely "that these PDFs [the Pledge Agreement and the Trust Agreement] were created using a single computer system,"[91] and that, like the Pledge Agreement, the Trust Agreement had been created using a Mac operating system that was released in 2015.[92] And the Trust Agreement, like the Pledge Agreement, was created in Preview (or *Voorventoning*, the Dutch word for Preview) which would require the

---

[88] Tr. 429.

[89] Tr. 392.

[90] Tr. 444; JX 198.

[91] JX 198 at 22.

[92] *Id.* at 20; Tr. 438–41.

user to scan in the original document, save a digital copy and then save a Preview version.[93]  According to Mr. Broidy, "[i]t doesn't seem to make sense why someone would do that" unless "the original has metadata that you don't wish to pass on" or the metadata has been altered on the document.[94]  Here again, if Hans had preserved the devices on which the Trust Agreement was created and stored, then Mr. Broidy would have been able to extract a "wealth more metadata about the original Word file that was created."[95]

The Court need not employ an adverse inference to conclude that Sara demonstrated by overwhelming evidence that the Trust Agreement relied upon by Hans prior to and during most of this litigation was not authentic.  The ramifications of this conclusion will be addressed below.

## II.  ANALYSIS

Pursuant to 6 *Del. C.* § 18-110 ("Section 18-110"), "[u]pon application of any member or manager, the Court of Chancery may hear and determine the validity of any . . . removal . . . of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may

---

[93] Tr. 441, 503.

[94] Tr. 506–08.

[95] Tr. 499, 502.

23

determine the person or persons entitled to serve as managers; and to that end make such order or decree in any such case as may be just and proper." Sara seeks a declaration under Section 18-110 that the following actions taken by Hans were void as a matter of law: (A) his removal of Sara as manager of IWCP and his appointment of himself as manager of IWCP and Loggio by written consent; (B) his transfer of Loggio's 70% interest in Villa Loggio to Oiggol; and (C) his transfer of voting control of IWCP to Oiggol. I address each of Hans' contested actions *seriatim* and then address Sara's request for counsel fees.

**A. Hans' Attempt to Remove Sara as Manager of IWCP and Loggio Was Ineffective.**

On May 30, 2016, Hans purported to act by "unanimous" written consent on behalf of IWCP and Loggio to remove Sara as manager of both entities.[96] Although he initially advised Sara in May 2016, and maintained through most of this litigation, that his authority to remove Sara as manager flowed from the Trust Agreement and the Pledge Agreement,[97] by the post-trial argument, Hans had abandoned his reliance upon both documents. Instead, he now relies solely upon his right to vote the Minor Children's interests in IWCP as their legal guardian under Italian law. Even if he

---

[96] JX 75.

[97] JX 4; JX 73; JX 102.

had that right, which I conclude he did not, his execution of that right was highly flawed and ineffective under Delaware law.

## 1. Hans' Attempt to Undo the Operating Agreement Fails.

Hans has urged the Court from the outset of this litigation to take notice of the fact that he was "the financial impetus behind the acquisition and operation of the vineyard" and that he has always acted as the "*de facto* manager" of IWCP.[98] According to Hans, the Court should interpret the Operating Agreement, and his actions with respect to IWCP and Loggio, with these background facts in mind. Hans ignores that the Operating Agreement is clear and unambiguous (he does not argue otherwise) and that it is a fully integrated document. There is nothing in that agreement that even remotely suggests that the parties intended that Hans' sponsorship of the entity should be accounted-for or that the Operating Agreement should be construed together with or modified by any other agreement. Hans has failed to offer any basis in law whereby the Court could afford him more rights in

---

[98] Defs.' Post-Trial Opening Br. at 4, 11 (pointing to provisions of a prenuptial agreement that was not listed as an exhibit in the pretrial stipulation or offered as an exhibit at trial); Tr. 286. *See also* Answer of All Defs. and Nominal Defs. to the Verified Compl. ¶ 18 ("[D]efendants believe and therefore aver that Plaintiff's role was limited to an advising board member and that actual management of the enterprise was conducted by Defendant, Hans Ensing."); Teleconference Pl.'s Mot. for Status Quo Order at 12–14 ("Doctor Ensing and his parents put up the money for the thing through a Dutch BV . . . . We question whether or not she has the technical skill. Doctor Ensing is the one who has the degree in viniculture and who is the financial guy behind the transactions. So we do challenge her competence.").

the management or operation of IWCP or Loggio than are provided in the unambiguous provisions of the Operating Agreement.[99]

### 2. Hans' Untimely and Ineffective Attempt to Invoke Italian Law Fails.

In the midst of trial, Hans filed a "Request for Judicial Notice of Foreign Law" (the "Notice") in which he invoked Rule 202(e) of the Delaware Rules of Evidence and requested that the Court take judicial notice of certain provisions of the "Italian Civil Code" and a ruling of the "Italian Supreme Court" relating to his rights as guardian of the Minor Children. This was his first notice to the Court and to Sara that he intended to rely upon these statements of Italian law to support his defense. Sara immediately objected on the ground that the notice was untimely and otherwise ineffective since Hans simply attached the code provisions and a copy of the Italian Supreme Court decision without any explanation of what they meant or how they might apply under the facts of this case.[100]

Sara's objection was well founded. Springing his Rule 202(e) notice on Sara and the Court on the night before the second day of trial ensured that Sara would not have an opportunity to consult with an expert in Italian law prior to trial or to present

---

[99] 6 *Del. C.* §§ 18-101(7), 111, 1101; *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[100] Tr. 258–262.

counter-evidence regarding Italian law during trial. Rule 202(e) contemplates that notice of an intent to rely upon foreign law will be given in a party's "pleadings or other reasonable time."[101] Hans' delivery of his notice during trial strayed far from that mark. Moreover, Hans offered no context in which either the Court or Sara could interpret the Italian law or apply it to these facts.[102] The Court will not venture a guess at how, if at all, the Italian law Hans has belatedly proffered might (or might not) apply here.[103] Hans has improperly invoked Rule 202(e) and his Notice is stricken.[104]

---

[101] *See* Ct. Ch. R. 44.1 (same).

[102] *Cf. Republic of Panama v. Am. Tobacco Co.*, 2006 WL 1933740, at *4 (Del. Super. Ct. June 23, 2006) (holding that the party relying on foreign law failed to meet its "burden of adequately proving the substance of the foreign law" when it presented affidavits from non-legal experts purporting to establish the foreign law).

[103] Nor will the Court accept Hans' eleventh hour invitation to apply Delaware law regarding parental rights to validate his attempt to vote the Minor Children's interests in IWCP to remove Sara. Hans has raised the issue too late and, in any event, has not demonstrated that Delaware domestic relations law would apply here.

[104] *See Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 122 (Del. Ch. 2000) (excluding evidence of foreign law because the party relying on that evidence "failed to give notice of its intent to rely on proof of foreign law as required by" Rule 202); *Block Fin. Corp. v. Inisoft Corp.*, 2009 WL 930482, at *1 (Del. Super. Ct. Apr. 2, 2009) (same). Federal law is in accord. *See* 9 James Wm. Moore et al., *Moore's Federal Practice*, § 44.1.04[1] (3d ed. 2006) (stating that "the party that wishes to rely on foreign law has the responsibility of demonstrating its content"); Jeffery F. Ghent, *Annotation, Pleading and Proof of Law of Foreign Country*, 75 A.L.R.3d 177, 2a (2004) (stating that "the courts appear to be in agreement on the general rule that the burden of proving the law of a foreign country is on the party relying on it"); *Bel-Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 440–41 (3d Cir.1999) (stating that "the parties . . . generally carry both the burden of raising the issue that foreign

### 3. The Minor Children's Rights in IWCP Are Governed by the Operating Agreement.

The very first paragraph of the Operating Agreement provides that Sara is to act as the guardian of the Minor Children with respect to IWCP:

> This Agreement is made as of April 25, 2012, among SARA HILDEGARD ENSING, SARA HILDEGARD ENSING *AS GUARDIAN OF [the Minor Children]*.[105]

In keeping with this arrangement, Sara signed the Operating Agreement on their behalf.[106] Thereafter, from its formation in the spring of 2012 until the summer of 2016, Sara acted pursuant to the Operating Agreement as guardian of the Minor Children concerning their rights in IWCP with no complaints from Hans.[107] For instance, Sara executed the First Amendment to the Operating Agreement on their behalf and then executed a unanimous consent in writing on their behalf in December 2013 when she replaced her brother as manager of IWCP.[108] Hans never challenged any of Sara's actions on behalf of the Minor Children with respect to IWCP. To the contrary, in February 2014, Hans executed a consent before a notary in Germany

---

law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case").

[105] JX 7 (emphasis supplied).

[106] *Id.*

[107] Tr. 72–74.

[108] *Id.*

expressly stating, "I agree with all declarations of Sara Hildegard Ensing which she has made as guardian of [the Minor Children]."[109]

Based on the plain language of the IWCP Operating Agreement, Sara alone was authorized to act on behalf of the Minor Children with respect to IWCP.[110] Thus, when Hans purported to act on their behalf to call a special members meeting to remove Sara as manager, to appoint himself as manager and to transfer IWCP interests without consideration, he did so without authority under the Operating Agreement. The actions, therefore, are void as a matter of law.

### 4. Hans' Failed to Give Proper Notice of the July 8 Meeting.

The Operating Agreement, at Section 5.02(d), provides that "[t]he Manager may be removed at any time, with or without cause, but only by the written consent of a Majority-in–Interest of the Members."[111] It further provides that the replacement of the removed Manager must occur "at the same meeting" where the Manager was removed or "at a special meeting of the Members called for that purpose."[112] Hans attempted to call that meeting on July 8, 2016. Rather than send

---

[109] *Id.*

[110] *Showell v. Pusey*, 2011 WL 3860419, at *2 (Del. Ch. Sept. 1, 2011) ("The relationship between members of the LLC, and their rights and duties, are as set forth in the [operating agreement].").

[111] JX 7.

[112] *Id.*

notice of the meeting to Sara at the address indicated in the Operating Agreement at Section 11.06 and Schedule 110.06, or at the address where he knew she was residing and where he had sent other papers he wanted her to see,[113] Hans elected to send Sara's notice of the special meeting to IWCP's registered agent in Delaware.[114] Sara, of course, did not receive the notice prior to the meeting.[115] Thus, even if Hans had authority to vote the Minor Children's interests in IWCP, which he did not, the actions he took at the July 8 meeting—including the removal of Sara as Manager of IWCP and the appointment of himself as Manager[116]—would still be void as a matter of law because he failed to give proper notice of the meeting to the IWCP members.[117]

---

[113] *See e.g.* JX 73 (Hans' letter dated May 30, 2016, mailed to Sara at her residence and attaching the Pledge Agreement); JX 121–122 (Hans' letter to Sara, mailed to her residence, demanding information regarding the winery).

[114] JX 24; Tr. 300–303.

[115] Tr. 85–86.

[116] JX 140.

[117] *See TravelCenters of Am. LLC v. Brog*, 2008 WL 5272861, at *1 (Del. Ch. Dec. 5, 2008) (holding that a notice that failed to comply with the LLC's operating agreement was "invalid and insufficient . . . and therefore [of] no force or effect"); *Adlerstein v. Wertheimer*, 2002 WL 205684, at *12 (Del. Ch. Jan. 25, 2002) (concluding that "actions taken at the July 9, 2001 meeting must be undone" because one shareholder did not receive adequate notice of the agenda of the meeting); *Lippman v. Kehoe Stenograph Co.*, 95 A. 895 (Del. Ch. 1915) ("It is, of course, fundamental that a special meeting held without due notice to all the directors is not lawful, and all acts done at such meeting are void.").

### B. Hans' Attempt to Transfer Loggio's Interests in the Winery to Oiggol Was Ineffective.

As noted, Hans purported to authorize a sale of Loggio's 70% interest in Villa Loggio to Oiggol on June 22, 2016, in his capacity as Board member of Loggio.[118] Two days later, Loggio and Oiggol entered into an agreement of sale whereby Loggio and Oiggol purported to complete the sale for €420,000.[119] The deed of transfer was prepared and filed with Italian authorities but the payment was never made.[120] Hans lacked any authority to act on behalf of IWCP or Loggio and certainly lacked authority to transfer Loggio's interest in Villa Loggio to any entity, much less an entity controlled by himself and his girlfriend.[121] The transfer is all the more troubling since Hans purported to authorize a self-interested transaction whereby the Minor Children's interests in Villa Loggio would be transferred for no consideration.[122]

---

[118] JX 116.

[119] JX 123.

[120] *Id.;* JX 136; JX 158; JX 161; JX 189; Tr. 99, 109, 362.

[121] PTO at 4–5.

[122] Tr. 362.

**C. Hans' Attempt to Transfer Voting Control from IWCP to Oiggol Was Ineffective**.

In addition to attempting to seize management control of IWCP and Loggio, Hans also purported to authorize, issue and then transfer 350 new membership units in IWCP to Oiggol during the July 8 meeting.[123]  Under the Operating Agreement, however, "[a]ny purported transfer of Units by a Member that is not in accordance with the provisions of this Agreement shall be *null and void* and shall not operate to transfer any right, title or interest in such Units to the purported transferee."[124]  At Section 8.08, the Operating Agreement requires any new member to enter "into a written instrument in form and content satisfactory to the Members whereby such Person joins in and becomes a party to this Agreement and thereby a 'Member' hereunder."[125]  The record contains no evidence that Oiggol ever executed any such "written instrument."  Even worse, nothing in the Operating Agreement allowed the Manager of IWCP, even the legitimate Manager, to authorize and then issue 350 new units of IWCP in the first place.  Even setting aside the fact that Hans had no right to remove Sara as Manager, his attempt to authorize, issue and then transfer the new IWCP units was void as a matter of law.

---

[123] JX 140.

[124] JX 7 at § 8.01.

[125] *Id.* at § 8.08.

### D. A Partial Shifting of Fees Is Warranted.

Most typically, under the American Rule, each party must bear its own litigation expenses, including counsel fees.[126] This court has the discretion, however, to shift litigation expenses, in whole or part, when a party to the litigation has engaged in bad faith litigation conduct.[127] This discretion is not exercised "lightly";[128] the court will invoke the bad faith exception to the American Rule only when the party seeking fee shifting has demonstrated by "clear evidence" that the party against whom the sanction is sought has acted in subjective bad faith.[129] In this case, I am satisfied that Sara has presented "clear evidence" that Hans engaged in subjective bad faith conduct prior to and during the litigation. She is entitled to litigation expense-shifting.

---

[126] *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1164 (Del. 1989).

[127] *Barrows v. Bowen*, 1994 WL 514868, at 81 (Del. Ch. Sept. 7, 1994).

[128] *Nagy v. Bistricer*, 770 A.2d 43, 64 (Del. Ch. 2000).

[129] *Arbitrium (Cayman Is.) Handels AG v. Johnston,* 705 A.2d 225, 232 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998) (noting that "[a]lthough there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims"). *See also Shawe v. Elting,* 2017 WL 563180, at *5 (Del. Feb. 13, 2017) ("Courts have also found bad faith where a party misled the court, altered testimony, or changed his position on an issue"); *Reagan v. Randell*, 2002 WL 1402233, at *3 (Del. Ch. June 21, 2002) (holding that the Court can shift such fees where "the underlying (pre-litigation) conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages" and where "a party's bad faith conduct increased the costs of litigation.").

*Raegan* is particularly instructive. There, the defendant relied on a shareholders agreement to argue that plaintiff had failed properly to remove him as a director and officer of a company in which he and the plaintiff were stockholders. This shareholders agreement "was the foundation for [the defendant]'s position," much like the Trust and Pledge Agreements had been the foundation of Hans' position both before and throughout most of this litigation.[130] The plaintiff (like Sara) testified that "she had never signed the Shareholders Agreement."[131] Because the defendant continued to press the shareholders agreement as a defense, the plaintiff (again like Sara) was forced to engage an expert to testify that the shareholders agreement "was a fraudulent document."[132] After forcing the plaintiff to jump through this and other hoops, on the eve of trial, the defendant (much like Hans did with the Trust Agreement) advised the plaintiff and the court that he would no longer rely upon the shareholders agreement. The court was not amused. It held that the plaintiff's unrebutted expert, along with other evidence, clearly demonstrated that the shareholders agreement was not what the defendant represented it to be. The defendant, nevertheless, had relied upon the document to

---

[130] *Reagan,* 2002 WL 1402233, at *2.

[131] *Id.*

[132] *Id.*

support his defense and had offered it to the court as evidence. This, the court concluded, was sufficient evidence of subjective bad faith to justify fee-shifting.[133]

Hans began his unlawful seizure of IWCP and Loggio by forwarding the sham Trust and Pledge Agreements to Sara, once on his own and once through the enigmatical Mr. Hunt. He then attempted to bully Sara into believing that these documents somehow empowered him to do what he could not do otherwise under the unambiguous terms of the Operating Agreement. When Sara was undeterred, and initiated this action, Hans presented and relied upon the Trust and Pledge Agreements in his first filing with this Court (his opposition to Sara's Motion for a Status Quo Order), throughout the hearing on that motion on August 1, 2016, in a letter to the Court on August 2, 2016 (in which his counsel advised that "certified copies" of the documents were being prepared), and again in his pre-trial brief. In order to secure evidence about these documents, and to advance her position that she never signed them, Sara was forced to file and present a motion to compel discovery on October 21, 2016, engage an expert witness to address the authenticity of the documents, file and present a motion for an adverse inference when Hans refused to comply with discovery orders relating to the documents, prepare and file portions of a pretrial brief that addressed the authenticity of the documents, prepare and present

---

[133] *Id.* at *5.

35

evidence at trial regarding the authenticity of the documents (including expert testimony), and prepare and file a post-trial brief (and present closing arguments) that addressed the authenticity of the documents.

Hans' bad faith did not end with the presentation of sham documents. He violated the Court's status quo order, forced Sara to depose him twice because he dumped a cache of documents on her at his first deposition (after the document production deadline in the trial scheduling order), intentionally ignored a court order to produce discovery relating to the sham documents and then made up a reason why he couldn't attend the trial as scheduled.

But for Hans' bad faith and meritless reliance on the sham documents, and his other subjective bad faith litigation conduct, Sara would have avoided substantial litigation expenses. He submitted false evidence, delayed proceedings by taking frivolous and inconsistent litigation positions and then awkwardly tried to "wash his hands" of the bad faith by attempting to withdraw the offensive evidence at the zero hour when it was far too late. This court has "broad discretion in fixing the amount of attorneys' fees to be awarded."[134] In this case, Hans will pay two-thirds of Sara's counsel's fees and expenses.[135] He will pay all of Mr. Broidy's fees and expenses.

---

[134] *Shawe,* 2017 WL 563180, at *7.

[135] I arrive at this allocation after taking into account that Hans based his defense on three positions: (1) the Trust Agreement; (2) the Pledge Agreement; and (3) his status as guardian of the Minor Children. Two of the three positions rested upon false evidence. Thus, a shift

Plaintiff will submit an affidavit setting forth these amounts within five days of this decision, along with an implementing order.[136]

## III. CONCLUSION

For the reasons stated above, I find for the Plaintiff and will enter final declaratory judgments in her favor as requested in the Complaint. Plaintiff shall submit a conforming final judgment, upon notice as to form, within twenty days.

**IT IS SO ORDERED.**

---

of two-thirds of Sara's fees is a "reasonable approximation." *In re Shawe v. Elting LLC*, 2016 WL 3981339, at *19 (Del. Ch. July 20, 2016).

[136] "Unless [defense] counsel [] produces their own billing records in full in support of an argument the [Plaintiff's] bills are too high, I shall consider the [Plaintiff's] amount sought to be reasonable. In objecting to the fee, [Hans] and his counsel should remember that it is more time-consuming to clean up the pizza thrown at a wall than it is to throw it." *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 882 (Del. Ch. 2012).